Bruce STEDMAN, Carl H. Abraham, on Behalf of themselves and all other shareholders of Northeast Airlines, Inc., similarly situated, Plaintiffs,

v.

George B. STORER, Sr., Storer Broadcasting Co., Northwest Airlines, Inc., Bill Michaels, Stuart W. Patton, Stanton P. Kettler, George B. Storer, Jr., Peter Storer, Francis W. Sullivan and Northeast Airlines, Inc., Defendants.

No. 69 Civ. 5180.

United States District Court
S. D. New York.
Dec. 23, 1969.

Burton L. Knapp, New York City, for plaintiffs.

White & Case, New York City, for defendants George B. Storer and Storer Broadcasting Co., David Hartfield, Jr., Jeffrey A. Barist, New York City, of counsel.

Reavis & McGrath, New York City, for defendant Northwest Airlines, Inc., Stephen R. Steinberg, Robert Thrun, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Northeast Airlines, Inc., George Leisure, Jr., Roy W. McDonald, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

On November 11, 1969, Donald W. Nyrop, President of Northwest Airlines, Inc., and George B. Storer, Chairman of the Board of Northeast Airlines, Inc., were reported in a joint press release to have reached "agreement in principle for a merger of the two airline companies." The release pointed out that Mr. Storer was Chairman of the Board of Storer Broadcasting Company, which owns 86% of the stock of Northeast. It was also stated that the proposed merger would leave Northwest as the surviving company, and that shareholders of Northeast would receive one share of Northwest common stock for each five shares of their Northeast. Finally, it was stated that consummation of the merger "was subject to a number of conditions, including the execution of formal documents and approval of the Civil Aeronautics Board, as well as approval by the Board of Directors of the parties and by the stockholders of Northeast and, if required of Northwest Airlines."

On the following day, another press release gave additional facts about the proposed merger. It was reported, *inter alia*, that on this day, November 12, the Storer board of directors had "approved the preliminary agreement at its regular quarterly meeting;" that the Northwest stock to be received by Storer for its 86% share of Northeast would not be entitled to dividends for three years after consummation of the merger, but that the minority Northeast shareholders would not be similarly disentitled; that a $10,000,000 indebtedness of Northeast to Storer for loan advances would be repaid with interest by Northwest upon conclusion of the merger, either in cash or in Northwest common, dividend-paying stock at the rate of $35.50 per share, at Northwest's option; and that Northeast losses, if any, "after October 31, 1969 to the date of consummation," would be borne by Storer, to the extent of 75% up to $8,000,000 and 100% above that figure, by a reduction in the number of Northwest shares payable to Storer, again computed on the basis of $35.50 per share.

Superficially at least, the proposed one-to-five exchange ratio was a thought-provoking feature of the announced agreement. On November 11, the day of the first announcement (following stock exchange hours), Northeast stock closed at 13⅞ while Northwest closed at 35, a ratio of about one to 2½. Upon

the basis of these market prices, Northeast stock (both the 86% held by Storer and the 14% held by others) appeared to have twice the relative value assigned to it in the merger deal.

Perhaps not surprisingly, the market price of Northeast stock dropped sharply after the announcement of the proposed merger. A large influx of orders to sell at the opening on November 12 led to a suspension of trading for that day. On November 13, the stock opened at 9¼ and closed at 8⅞, off five dollars from its closing price of November 11.[1] At the same time the price of Storer Broadcasting stock rose appreciably, from $35 to $45 on November 12, then dropped back to $40 by the end of trading on November 13.

While the evidentiary materials before the court at this stage are not sufficient for exhaustive or refined analysis, it appears to be essentially undisputed that Storer's 86% interest in Northeast had been a costly burden, and that investors could have viewed the projected surcease as a boon enhancing the value of Storer stock.

Upon the foregoing facts alone, the step leading to the court's present concerns might have been predicted: the plaintiffs herein—Northeast shareholders since, respectively, December 1965 and September 1969—brought this latest in the increasing roster of suits under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] Acknowledging that Storer's 86% share of Northeast stock assures approval of the merger by their company, plaintiffs have proceeded against George B. Storer, Sr., Storer Broadcasting, officers and directors of Storer Broadcasting and Northeast, and both Northeast and Northwest for equitable relief to correct an alleged course of false statements and material omissions said to have occurred in violation of the cited statute and rule. In addition to describing the press releases of November 11 and 12 and the ensuing stock price fluctuations, the complaint charges that defendants George B. Storer, Sr., and Storer Broadcasting "dominate and control" Northeast and the other Northeast directors named as defendants. It is alleged that the defendants have conspired since December 1968 to engage in a course of false statements, omissions and other deceitful actions to the injury of Northeast and its public stockholders. The allegedly unlawful objectives are said [par. 12(i)] to have included market manipulations to compel minority stockholders like the plaintiffs "to sell their Northeast stock to Northwest at prices substantially below the prices which the plaintiffs and other public shareholders would otherwise sell their Northeast stock if certain material facts * * * had been disclosed to them * * *." Also, it is said, *id.* (ii), that defendants purposed "to force the minority shareholders of Northeast to accept a plan of merger with Northwest on terms which would operate exclusively for the benefit of Storer Broadcasting and Northwest at the expense of the minority shareholders of Northeast."

1. The initial questions generated by the sharp decline in the price of Northeast stock have not led, at least thus far, to indications of wrongful behavior by the defendants. While the anonymous mysteries of "the market" had valued the stock at $14 per share (and even more at prior times), it is difficult to perceive bases in economic fact for such a figure. Northeast's financial picture was bleak at best. The company had reported a decline in earnings for the six months ending June 1969 with a loss for the period of $1,289,360 as against income for the comparable period of the prior year of $2,141,508. The shareholders' equity decreased from $1.03 per share at the end of 1968 to $.84 at the end of June, 1969.

2. The court's jurisdiction is invoked under § 27 of the 1934 Act, 15 U.S.C. § 78aa. There is also a second count, asserted under "principles of pendent jurisdiction and diversity of citizenship" (par. 26), seeking damages for breaches of fiduciary obligation by defendant directors of Northeast. This is not a subject requiring consideration at this stage.

The complaint goes on to allege a number of details in the asserted conspiracy which have either been refuted or forgotten for the time being,[3] and which are not in any case of special interest now.

Our direct and immediate concern is plaintiffs' motion for a preliminary injunction to restrain defendants

"(a) from making false and misleading statements or omitting to disclose fully and accurately all material facts in violation of Section 10(b) * * * and rules and regulations thereunder, in connection with the sale by Storer Broadcasting * * * of its 86% interest in Northeast * * * to Northwest * * * or otherwise in connection with a proposed merger of Northeast into Northwest;

"(b) from making any public report or statement concerning the proposed merger * * * until there is furnished to all of the minority stockholders of Northeast full and complete information as to [specified matters alleged to have been subjects of false statements or material omissions]; and

"(c) enjoining Storer Broadcasting and its Chairman and principal stockholder, defendant George B. Storer, Sr. from holding a meeting of the board of directors of Northeast or a meeting of shareholders of Northeast for the purpose of [approving the merger pending decision of the instant motion or a trial of the action.]"

In addition to the information upon which the action and motion for preliminary relief were instituted, plaintiffs have been permitted, under the court's directions, to obtain discovery to buttress their claim for an injunction *pendente lite*. Documents have been produced by defendants under Fed.R.Civ.P. 34. Defendant Bill Michaels, President of Storer Broadcasting, gave deposition testimony for two days. Earlier, plaintiff Stedman was deposed by attorneys for Storer Broadcasting. These evidentiary materials, plus the familiar array of affidavits (containing few, if any, factual disputes of consequence) have been treated by both sides as a sufficient evidentiary basis for the court's determination of the preliminary injunction motion.

■ Upon the factual foundation thus laid, the parties have mounted several levels of legal argument—as to the adequacy of the complaint to state a claim, the standing of plaintiffs, and some old-fashioned notions about equity which nobody yet suggests have gone out of style. Enlightened by all this, the court has found nevertheless that defendants' first line of defense, on the facts, is substantially decisive at this stage. Whatever may happen if the case proceeds through a plenary trial and final decision, the factual showing now tendered as a basis for injunctive relief is entirely insufficient. The claims of falsity and material omission appear to be almost wholly unfounded or beside the point or both. The likelihood of ultimate success in this fundamental area of fact is too thin to justify any measure of the drastic relief plaintiffs seek. When

---

3. For example, conspiratorial actions are alleged beginning back in December 1968, but no basis has been suggested for any charge of any kind reaching that far back. It is charged that a $10 million loan from Storer to Northeast on September 3, 1969, was without risk to the lender because of pending "secret merger negotiations with Northwest" at the time, but it seems plain, at least as of now, that there were no such negotiations, secret or otherwise. It is said that Northeast was caused, for sinister reasons, to change accounting methods in 1969 and thereby darken its financial picture; but the only pertinent evidence is to the contrary. The complaint charges enforced adherence by Northeast to the terms of an aircraft lease with a Storer subsidiary as lessor; but the evidence indicates that the lease arrangements are favorable to Northeast and that the lessor could do better elsewhere.

this deficiency is considered with the competing equities—including the lack of any temporal emergency and the narrowly monetary character of plaintiffs' hurt—the court is compelled to deny the motion.[4]

The simplest way to explain the court's critical determination as to the facts is to consider *seriatim* the eight items plaintiffs present as comprising "the heart" of the case.[5] In the discussion which now follows, each of these items is stated in plaintiffs' words and then briefly discussed.

 1. "The independent directors of Northeast—including James A. Austin who owned over 50,000 shares of Northeast stock—were never consulted in advance concerning the proposed merger with Northwest."

▇ The proposition is not disputed. Nor is it claimed that "disclosure" was made of this in the press releases of November 11 and 12. Austin, like the other directors, will have occasion to consider the proposed merger when it comes on for the board's judgment. But there is no pertinent requirement for advance consultation with him and no basis for the view that the absence of such consultation (with Austin or others who could presumably be named) was a fact which had to be "disclosed," or the nondisclosure of which made the things that were said misleading.

 2. "The merger negotiations were conducted solely by individuals in Northeast's management who do not own a single share of Northeast stock."

▇ Thoughts similar to those concerning Item "1" apply here. It is not to be doubted, of course, that the relationships between Storer and Northeast, together with the Storer stockholdings of Northeast managerial people, create a touchy situation. It may well be, moreover, that any proxy materials relating to the proposed merger will have to include information about this. See S.E.C. Rule 14a–3 and Schedule 14A, 17 C.F.R. §§ 240.14a–3, 240.14a–101. But that is a far cry from the unsupported and unpersuasive suggestion that any announcement of a major Northeast transaction must incorporate this information or be actionable misleading because of the omission. As for the fact that the Northeast management people in question do not own Northeast stock, this would appear to be a virtue rather than a vice.[6] The dispositive point in any event remains that there was no need to tell about this in the press releases.

 3. "On November 11, 1969, SBC agreed to accept substantially *less* favorable terms for the minority shareholders than Northwest had offered in a proposal made by Northwest some 2 weeks earlier on October 28, 1969, despite the fact that there was no material change in the price of either Northeast stock or Northwest stock during the intervening period." (Emphasis in original.)

▇ One short answer to this is that the prior "offer" of Northwest to which plaintiffs refer never happened. But apart from this, there is no suggestion of a sound reason in fact or in law why

---

4. However inappropriate the case is for preliminary relief, the complaint does appear to *allege* a claim for injunctive relief under § 10(b) and Rule 10b–5, Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967); Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962), and plaintiffs in their individual capacity have standing to assert this claim. Mutual Shares Corp. v. Genesco, *supra*, 384 F.2d at 546–547. The court does not reach plaintiffs' further theory that they may sue derivatively on behalf of Northeast.

5. This phrase, from the oral argument, refers to a listing in Plaintiffs' Reply Memorandum (pp. 10–12) which, reflecting the benefits of discovery, assertedly reveals (*id.*, p. 1) "a state of affairs far worse that that indicated in the complaint." Much of the oral argument centered on this list. Its destruction is dispositive of the motion.

6. Cf. New York Stock Exchange, The Corporate Director and the Investing Public 11 (November 1965).

announcements of the kind in question must report prior bargaining positions—or, more specifically, why the prior position, even as plaintiffs incorrectly imagined it, would have had to be "disclosed." There is no ground for supposing it would have helped anybody to be told about what might have been, but never was, as of one point or another in the negotiating process.

4. "It was the potential effect of the merger on the market value of *SBC stock* (in which SBC's principals were primarily interested) rather than the effect on the value of Northeast stock held by the minority shareholders, which motivated SBC to hastily enter into the Northwest merger." (Emphasis in original.)

 If this broad characterization is ever vindicated (as it has not been so far), and if resulting damage to plaintiffs can be shown, they may prevail on their second claim—for damages for breach of fiduciary duty. But it is bemusing, and ultimately pointless, to charge that directors perpetrated a "material omission" when they failed to (a) discover and adjudge faithless motives for their actions and (b) announce such a discovery in reporting the products of their managerial efforts and judgment. The securities laws, while their central insistence is indeed upon disclosure, were never intended to attempt any such measures of psychoanalysis or reported self-analysis. The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external. Cf. Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. December 10, 1969); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, Coates v. Securities and Exchange Comm., 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

5. "If the merger was not agreed upon and announced by November 11 at the latest, SBC's directors at the SBC meeting held on the following day, November 12, might have been compelled to omit SBC's quarterly dividend payment for the first time."

 Again, the fundamental defect is a mistake of fact—or, at least, an entire failure of proof. There is agreement that Storer Broadcasting has happier prospects now that the parental burdens of its Northeast control seem destined for transfer. But there is at most flimsy and speculative basis for the quoted assertion about Storer's dividend. Here, as elsewhere in plaintiffs' theses, there is cause to wonder who would have benefited from the allegedly required disclosure and who was misled by its omission. But this hypothetical subject is not one that should detain us further.

6. "During the course of merger discussions with Northwest, no effort was made by SBC to protect the minority shareholders by insisting upon a minimum value for the Northwest stock to be issued to the public in the event of a market decline (which subsequently occurred)."

 It appears, though by no means to a certainty, that the quoted sentence is literally correct (that is, an effort was made to *obtain* the minimum, but it was not made a sticking point). What does not appear is why it is thought to make a difference. Even less fired imaginations than plaintiffs' could undoubtedly generate small lists of things good for Northeast stockholders (including Storer) that were neither obtained nor even sought in the bargaining with Northwest. If fair disclosure required a reporting of such things, the obligation would be an impossible one. Whether or not the minimum should have been insisted upon may well be arguable. But there is no ground in law or sense for the reporting requirement plaintiffs assert.

7. "Merger discussions were being conducted by SBC with TWA Airlines and Delta Airlines; TWA had initially offered a price for Northeast in excess of that offered to Northwest, and the TWA offer was not pursued by

SBC because of SBC's anxiety to agree to a merger, any merger, prior to SBC's dividend meeting on November 12, 1969."

The quoted statements were conceded on argument to be factually unsupportable.

8. "SBC stands to recover well in excess of $120,000,000 over the remaining term of presently existing aircraft leases with Northeast, as well as repayment in full of a $10 million note issued by Northeast. In addition, SBC through a wholly owned subsidiary, Storer Leasing Company, will be able to take maximum advantage of investment credits and tax loss carryforwards in connection with such leases, with substantial economic benefits inuring to SBC."

■ This last item seems to arise from a welter of confusion. The complaint, as has been mentioned, touches the subject when it says, in par. 13(e), that pursuant to the alleged conspiracy:

"In 1965, Storer Broadcasting, through a wholly owned subsidiary, entered into agreements to lease aircraft to Northeast for a term of 13 years from the date of delivery of the equipment at rentals well in excess of $9 million annually. Despite the fact that Northeast has a right under the lease agreement to voluntarily terminate the same with respect to obsolete or surplus aircraft, George B. Storer, Sr. and Storer Broadcasting caused Northeast to continue said lease in full force and effect, in view of the arrangements made by said defendants with Northwest that following the proposed merger, Northwest would assure payment of the lease obligation."

The suggestion has been that Storer bound Northeast to onerous lease arrangements and has used the Northwest transaction as a mode of exacting ransom. But the only evidence on the matter is that the lease contracts are highly favorable to Northeast and that Storer could realize greater profits by leasing the aircraft involved to others. At this point it is not possible to know how plaintiffs can purport to press the subject. It is enough to say, however, that there is no basis for their complaint about the alleged omission. It is undoubtedly true that Storer, like other obligees, hopes to have its claims upon Northeast paid. But the suggestion of fraudulent concealment in this final respect seems baseless.

In the circumstances of this case, the high probability that plaintiffs will fail for want of proof is enough to defeat their application for a preliminary injunction. There are situations where disruption of the status quo would be so disastrous that the raising of "difficult and doubtful" questions may be enough for the imposition of restraints to prevent "the parties from harming one another during the litigation * * *." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740, 742 (2d Cir. 1953). Plaintiffs have not generated enough difficulty and doubt even by that test. In addition, however, their claimed need for freezing the situation is weak. It appears that the projected merger cannot be accomplished within less than a year or so—what with the need for corporate actions, C.A.B. approval, and other procedures. In the meantime, there is ample opportunity for discussion and exposure of speculations and charges like those on which plaintiffs mainly proceed. The defendants, not shown to have been untruthful, would suffer obvious injury from a preliminary injunction ordering them to be truthful. The hurt might extend to the corporations named as defendants and to their shareholders. Plaintiffs, on the other hand, though they prefer not to be pinned down about this, are suing after all for relatively simple monetary losses caused by alleged misbehavior diminishing the value of their stock. While the relative adequacy of such a potential remedy at law need not be a barrier to injunctive relief in a proper case under § 10(b) of the 1934 Act, see Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546–547 (2d Cir. 1967); cf. Electronic Specialty

Co. v. International Controls Corp., 409 F.2d 937, 947 (2d Cir. 1969); Chris-Craft Industries, Inc. v. Bangor Punta Corp., 2d Cir., No. 33983, (slip op., —— Nov. 6, 1969, not otherwise reported), it is still a factor. And in this case it appears to be a matter of prime, if not conclusive, significance.[7]

The motion for a preliminary injunction is denied. So ordered.

7. Plaintiffs have attempted to demonstrate the inadequacy of their remedy at law by emphasizing the undisputed fact that the minority shareholders of Northeast will be unable to block the merger, "and no causal connection could be claimed to exist between [any] proxy deception and approval of the merger." This is quite beside the point, however. If plaintiffs can ever demonstrate that they have suffered injury from some act or omission violative of the securities acts, they may recover, irrespective of their impotence to stop the merger. Compare Barnett v. Anaconda, 238 F.Supp. 766, 773 (S.D. N.Y.1965), with Vine v. Beneficial Finance Co., 374 F.2d 627, 635 (2d Cir. 1967), and Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787 (2d Cir. 1969).