Harry LEWIS, Plaintiff,

v.

OPPENHEIMER & CO., Big Bear Stores Company, a Delaware Corporation (formerly called B. B. Stores Company), Big Bear Holding Company, Marilyn Brown Kellough and E. C. Redman as co-executors of the Estate of Wayne E. Brown, Michael J. Knilans, Lawrence E. Mack, Stephen Kellough, David W. Godfrey, E. C. Redman, Individually, and R. D. Wickerham, Defendants.

No. 79 Civ. 2109(MP).

United States District Court,
S. D. New York.

Dec. 21, 1979.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff by Robert M. Kornreich, Donald N. Ruby, and Klari Neuwelt, New York City.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for defendants (Big Bear Stores Company, Big Bear Holding Company, and Oppenheimer & Co.) by Warren H. Colodner, and Robert C. Macek, New York City.

Cahill, Gordon & Reindel, New York City, for defendants Michael J. Knilans, Stephen Kellough and David W. Godfrey by Michael P. Tierney, Charles A. Gilman, and John C. Koutsos, New York City.

## OPINION

POLLACK, District Judge.

Defendants move to dismiss this complaint pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 9(b) for lack of subject matter jurisdiction, failure to state a claim upon which relief can be granted, and failure to plead fraud with the requisite particularity.

## PRELIMINARY

At the August 16, 1976 annual meeting of stockholders of Big Bear Stores Company (Old Big Bear), listed on the American Exchange, approximately 95% of the company's more than 5,000 stockholders voted the sale of substantially all of the company's assets for cash, subject to substantially all of its liabilities pursuant to a plan set out in a proxy statement dated July 24, 1976. The sale was made on August 30, 1976, and the assets were transferred to a newly organized company (New Big Bear) which is owned by Big Bear Holding Company, which in turn is owned by Oppenheimer & Co. (Oppenheimer) and its associates. The stockholders of Old Big Bear were given three options under the plan: (1) to remain shareholders in Old Big Bear which was converted into an investment company holding tax free securities and renamed Scioto Investment Company; or (2) to tender their shares at $33 per share to Old Big Bear; or (3) to exercise their rights to an appraisal under the laws of Ohio and obtain the appraised value for their stockholdings.

The plaintiff, owner of an unstated minor number of common shares, tendered his shares pursuant to the plan of sale and received $33 per share therefor on or about September 24, 1976. Almost three years later he instituted this suit on his own behalf and on behalf of others similarly situated whose stock was also tendered and redeemed in 1976 at $33 per share, claiming that this was a grossly unfair and inadequate price and that the conduct of defendants in arranging such a tender and redemption violated Rules 14a–9 and 10b–5

promulgated under the Securities Exchange Act of 1934, as amended. No class designation has been presented or authorized as yet.

The defendants are New Big Bear, a Delaware corporation, which purchased the assets of Old Big Bear; the Big Big Holding Company, which owns the stock of New Big Bear; Oppenheimer, which owns 70% of the stock of the Holding Company; and three individuals, Michael J. Knilans, Stephen Kellough, and David W. Godfrey, who were former officers and directors of Old Big Bear.

■ The claim essentially turns on the alleged deceptive inadequacies and misrepresentations in the proxy statement for the 1976 annual meeting, and on alleged delay in disclosure of favorable operating results for fiscal 1976. The plaintiff asserts that the disclosure was delayed in order to hold down the market price of the stock until after the announcement of the $33 offer to stockholders as part of the plan of the company to sell its assets and go private.[1]

The defendants contend that the proxy statement was proper in all respects and that there were no improper omissions or deception in the disclosures.

The motions may be considered under Fed.R.Civ.P. 56 in the light of the proofs that have been submitted. For the reasons shown hereafter, defendants are entitled to summary judgment dismissing the complaint.

### 1. The company involved

Old Big Bear operated 54 supermarkets in Ohio and West Virginia. Through subsidiaries it also operated a chain of 12 discount department stores and two drug stores in Ohio, West Virginia, and Kentucky; a central bakery and a trading stamp distributor to supply its supermarkets; and 16 redemption centers where the trading stamps are redeemed for premiums. The company also owned its own fleet of trucks to deliver merchandise to its stores.

Old Big Bear's net sales for fiscal 1976 (ending on February 28, 1976) were approximately $319,000,000, up from approximately $288,000,000 the year before. Its common dividend, based on earnings of $5.63 per share, was $1.21 per share in 1976, up from $1.12 for the preceding year. In both years there were 1,070,768 class A common shares outstanding, held in 1976 by more than 5,000 public shareholders. These shares traded on the American Stock Exchange at prices ranging between $12.00 and $24.75 per share in 1974; between $12.12 and $25.25 in 1975; and between $22.00 and $32.00 in 1976 up to July 20, the last date for which information was included in the July 24, 1976 proxy statement.

### 2. Chronology of the transaction

Chronologically, the questioned transaction developed as follows:

October 1975　An offer was made to purchase the assets of Old Big Bear at the equivalent of $28 a share. During the quarter ending November 29, 1975, the stock traded at between $18.00 and $25.25.

January 5, 1976　Old Big Bear announced its earnings of $1.66 per share for the third quarter of fiscal 1976.

January 8, 1976　Old Big Bear publicly announced discussions about the possible sale of its assets at the equivalent of $31.00 per share.

March 2, 1976　Old Big Bear released estimated sales for the quarter and the

---

1. In his brief and at oral argument, counsel for plaintiff has abandoned any argument that a § 9 or § 10(b) claim for "manipulation" could be stated on the facts of the present case. "Manipulation" is a term of art with a narrow definition of engaging in practices such as wash sales, matched orders, or rigged prices in order to mislead investors by artificially affecting market activity. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 42, 97 S.Ct. 926, 51

L.Ed.2d 124 (1977). Plaintiff argues instead that the gravamen of the complaint is "deception" and not "manipulation" in that defendants failed to disclose that certain public announcements were timed to put a ceiling on the price of Old Big Bear stock. Thus the dispositive issue on the present motion is the adequacy of Old Big Bear's disclosure to its public shareholders.

year ending February 28, 1976, showing estimated sales for the quarter up 15.7% to $87.5 million, and for the year up 10.8% to $322.9 million.

April 19, 1976 Tentative agreement was reached for the sale of assets at the equivalent of $33.00 per share.

April 22, 1976 Old Big Bear issued its certified financial statements for fiscal 1976, showing actual sales of $319,004,-860, some three million dollars below the March 2 estimate.

April 24, 1976 Old Big Bear published its Annual Report to Shareholders showing among other things earnings of $5.63 per share.

June 30, 1976 The sale agreement was signed, subject to shareholder approval.

July 6, 1976 Old Big Bear announced its sales and earnings results for the quarter ending May 29, 1976 showing earnings of $1.46 per share for the quarter.

July 12, 1976 Record date for the 1976 annual meeting.

July 24, 1976 The proxy statement was issued, containing as exhibits: a copy of the Agreement of sale dated June 30, 1976 (exhibit 1); an opinion letter from the Ohio Company as to the financial fairness of the proposed sale (exhibit 2); a copy of the Partnership and Management Agreement (exhibit 3). The proxy materials also included a copy of the annual report and the proxy statement incorporated by reference the financial statements contained in the annual report.

August 11, 1976 Wayne E. Brown, the company's principal stockholder, died.

August 16, 1976 The annual meeting was held in Columbus, Ohio. 95% of the shares were voted to approve the sale of assets. Plaintiff Lewis did not vote against the sale or the amendment of the Amended Articles of Incorporation.

August 30, 1976 The sale of assets transaction closed.

September 24, 1976 Plaintiff Lewis tendered his shares for $33.00 per share.

September 27, 1976 The stock of Old Big Bear is traded on the American Exchange for the last time.

April 23, 1979 Plaintiff Lewis filed his complaint herein alleging securities laws violation.

### 3. The gravamen of the claim asserted

Plaintiff contends that the proxy material omits or misrepresents certain information which "a reasonable shareholder would consider . . . important in deciding how to vote." *T.S.C. Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The alleged omissions consist of the expected future compensation for the directors of New Big Bear (former officers and directors of Old Big Bear), the income tax basis of the stock owned by Wayne E. Brown (Old Big Bear's founder and majority shareholder), the identities of the owners of a 30% interest in the Holding Company, the buyers' method of financing the purchase, Old Big Bear's future prospects, and certain past transactions with the Ohio Company, an investment banking firm that reviewed and approved the sale and recommended it to the shareholders.

Careful examination reveals that each of the matters allegedly omitted was sufficiently disclosed in the proxy itself or in the materials accompanying the same furnished to each stockholder, or was immaterial for the consideration of the cash transaction involved.

### A. Expected compensation for the directors

As part of the sale transaction, the buyers and the top management of Old Big Bear entered into a Partnership and Management Agreement, by which the former directors and officers of Old Big Bear would continue to run the business for New Big Bear and share in an incentive profit fund that would be computed according to a certain formula. Plaintiff alleges that this compensation arrangement was the motivating factor behind the directors' approval of the proposed sale, and that this motiva-

tion was insufficiently disclosed to Old Big Bear's shareholders in the course of soliciting their proxies.

■ It is well established, however, that for purposes of the federal securities laws, the actual subjective motives behind a controlling shareholder's recommendation of a transaction need not be disclosed, as long as the relevant underlying facts are disclosed. *Rodman v. Grant Foundation,* 460 F.Supp. 1028 (S.D.N.Y.1978), *aff'd,* 608 F.2d 64 (2d Cir. 1979); *Golub v. PPD Corporation,* 435 F.Supp. 564 (E.D.Mo.1977)[2] *aff'd,* 576 F.2d 759 (8th Cir. 1978); *Biesenbach v. Guenther,* 588 F.2d 400 (3d Cir. 1978).

In *Rodman, supra,* this Court reviewed the Second Circuit cases decided after *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), in which the Supreme Court held that the proper forum in which to litigate alleged breaches of corporate fiduciary duty is the courts of the state whose laws created the corporation, and not the federal courts under the anti-fraud provisions of the federal securities laws. As we said in *Rodman,* 460 F.Supp. at 1038:

> These cases may not have settled whether one must disclose the facts giving rise to a conflict of interest . . . .. But even if such a duty exists, it was satisfied here. The cases do make clear, though, that failure to disclose on top of such facts one's actual subjective purpose does not violate the securities laws.

In *Golub, supra,* a complaint alleging nondisclosure was dismissed where the proxy statement disclosed the bonus agreement itself, but no description of it was made as a reward or premium for the sale of the business and no statement of the controlling shareholders' motives was made. The complaint that was dismissed in *Biesenbach, supra,* alleged that the board of directors deceived the minority shareholders by advising them that a loan from the directors to the corporation was in the best interests of the corporation, while the directors were collecting interest at 4% over the prime

rate. In affirming the district court's dismissal of the complaint, the Third Circuit quoted from *Stedman v. Storer,* 308 F.Supp. 881, 887 (S.D.N.Y.1969):

> The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external.

■ The equally compelling reason for dismissing this much of the plaintiff's claim is that the facts about the expected compensation of the directors were fully and clearly disclosed in the proxy materials. The proxy statement (p. 11) told the shareholders that they should be aware that

> . . . all but one of the directors of the Company will, upon consummation of the proposed sale, be parties to the Partnership and Management Agreement (See "Partnership and Management Agreement" below) and, accordingly, have interests in the transaction other than as shareholders or directors of the Company.

The proxy statement also explained the terms of the incentive profit-sharing fund and gave an illustration of the way in which it would be computed (pp. 15–17). Furthermore, the full text of the Partnership and Management Agreement was appended as an exhibit to the proxy statement.

Plaintiff does not dispute that these disclosures were made; nor does he argue that they were "buried" in some inconspicuous corner of the proxy materials. His sole contention about the disclosure of the directors' compensation is that the example used was misleading in that the actual profits expected were greater than the figures used in the example. The answer to this charge is that the illustration purported to be no more than just that. A reasonable shareholder can be expected to realize that a profit-sharing fund based on earnings will vary and increase as the company's earnings vary and increase. Corporations, in the words of Judge Mansfield (now on the Court of Appeals), "are not required to ad-

---

**2.** The District Court opinion spells plaintiff's name with two l's—Gollub.

dress their stockholders as if they were children in kindergarten." *Richland v. Crandall*, 262 F.Supp. 538, 554 (S.D.N.Y. 1967). The profit fund formula may have been complicated, but it was not deceptive or misleading.

### B. Wayne E. Brown's tax basis

Wayne E. Brown was Old Big Bear's founder and controlling shareholder who, alone among Old Big Bear's officers and directors, committed himself not to surrender his shares for redemption but to remain a shareholder in what was to become Scioto Investment Company. Brown died on August 11, 1976, before the transaction was approved, and never became a party to the Partnership and Management Agreement.[3] Plaintiff alleges, however, that the primary reason for the structure of the transaction was to serve the income tax advantages that would accrue to Brown.

Everything set forth above about the immateriality of the actual subjective motives applies with equal force to the allegations about the income tax basis of Brown's stockholdings. In addition, the proxy statement (pp. 13–14) pointed out that individual and different tax consequences would follow the decision on whether or not to redeem one's shares.[4] It also contained the following facts about Brown: that he was the Company's President and largest shareholder (p. 3); that he had been a director since 1933 (p. 5) and that the company had been founded in 1933 (p. 19); that he intended not to redeem his shares but to remain a shareholder of Old Big Bear after it became the Scioto Investment Company (pp. 10, 11); that he would operate the investment company (p. 10); and that he controlled 61.2% of the voting power of Class A and Class B Common Shares, and 67.95% of the voting power of the Prior Preferred Shares (pp. 17, 18). The Compa-

ny's Form 10–K for 1976, filed with the Securities Exchange Commission in May 1976, also referred to Brown as the "founder of the Company and . . . its chief executive since 1933."

Plaintiff argues that the proxy statement should have included and even highlighted the historical price at which Brown acquired his shares, and that the inference of a low income tax basis cannot be drawn from the "meager information" in the proxy statement. Plaintiff points to a proxy statement issued by Reliable Stores, Inc., (Kornreich affidavit, exhibit C) in a similar going private transaction involving Oppenheimer, and argues that it, in contrast to Old Big Bear's proxy statement, is an example of adequate disclosure of the tax issues that plaintiff challenges here.

It is difficult to see how a different proxy statement issued by a different company, in a different business, in a different part of the country, some 18 months after the proxy statement at issue here, can have any relevance to the case at hand. The logical conclusion of plaintiff's argument must be that all proxy statements must be similarly worded, or that liability will attach whenever a dissident party can quibble with a proxy statement's manner of presentation. The fact of the matter is that the Old Big Bear proxy statement disclosed all the relevant facts about Brown's interest in the transaction over and above that of a typical shareholder or director.

Plaintiff, however, argues that *S.E.C. v. Parklane Hosiery Co.*, 558 F.2d 1083 (2d Cir. 1977), and an S.E.C. investigation release, *In Re Spartek*, [1979] CCH Fed.Sec.L.Rep. ¶ 81,961 (S.E.C., Feb. 14, 1979), dictate that this Court should hold the absence of Brown's tax basis *in haec verba* from the proxy statement to be a material omission in violation of the proxy rules.

---

**3.** Following a pre-motion conference with the Court in August of 1979, plaintiff dismissed from this suit without prejudice the executors of Brown's estate, as well as three other individuals who either did not become part of New Big Bear's management or were not directors of Old Big Bear.

**4.** The proxy statement (p. 11) disclosed that those shareholders who did not redeem their shares would recognize no gain or loss for tax purposes.

*Parklane* does not dictate any such conclusion. There the Court affirmed the finding of a material omission in a going private transaction where the true purpose of the transaction was to enable the controlling shareholder to satisfy his personal debts from the company treasury and there was "not so much as a hint" (558 F.2d at 1086) of those debts in the proxy statement. By contrast, the Old Big Bear proxy statement revealed all the facts of Brown's supposedly tax-inspired interest in the transaction, except the prices at which he had acquired all of his many shares. Such an omission hardly rises to the level of the flagrant misappropriation of corporate assets for personal use found in *Parklane*.

*Spartek* was an investigation release by a divided S.E.C. concerning a corporation's failure to file a timely Form 8–K disclosing a proposed sale of assets in a going private transaction. In the release a majority of the commissioners asserted *in obiter dictum* that Spartek's preliminary proxy statement should have disclosed, *inter alia*, that certain insiders who would continue to run the business for its new owners [5] had a very low tax basis for the 40% of the common stock that they owned.

*Spartek* is neither controlling nor persuasive here for at least two reasons. First, the facts of that transaction are materially different from those of the present case. The Spartek preliminary proxy statement, for example, failed to indicate that Spartek's insiders had any potential conflicts of interest or any interests in the transaction other than the proposed payment for their shares which exceeded the market price at the time. During the negotiations, Spartek's management made representations to the buyers that Spartek's properties contained substantial natural gas reserves. Those representations were not disclosed to the shareholders. Once the negotiations had begun and the price of Spartek stock on the American Exchange began to increase, Spartek's management flatly and falsely denied to Exchange officials who made inquiries that there were any unannounced corporate developments. None of these factors was in any way involved in the present case. Indeed, the preliminary proxy statement at issue here was reviewed by the S.E.C. Its comments on June 4, 1976 did not fault the proxy statement on grounds here asserted and its comments were complied with by the company in the final form which went to shareholders. While not dispositive or to be relied on, it is significant nonetheless that the *Spartek*-type averments were not aimed at this proxy statement.

The second reason that *Spartek* does not carry the day for the plaintiff herein is that the release by the S.E.C. is not relevant or dispositive except as presenting the divided viewpoint of a regulatory agency in respect of its filing requirements. It is not evidence controlling on a court, nor is it entitled to credit beyond its own facts. It does not avail a litigant to ride piggy-back on such opinions in seeking a court recovery under federal damage standards where none is warranted.

The commissioners themselves pointed out in *Spartek* the absence of the critical Court appraisal right accorded here under state law, in that they stated the need for disclosure is "underscored where recognized procedural protections for shareholders, such as appraisal rights under state law, are not present." *Spartek, supra*, at 81,407 n. 21. In the case at hand the minority interest was carefully conserved and expressly stated in the plan. The company provided a valid state court remedy—appraisal under Ohio law—for any differences of opinion on value. That is where—if anywhere—this case belongs—in state court. The income tax situation of each stockholder is personal business, and absent injury to the corporation, is irrelevant to damage claims under the federal securities laws.

5. Oppenheimer was one of the original buyers, but withdrew from the purchasing group in October 1978, after the Commission's investigation had commenced. See *Spartek, supra*, at p. 81, 403 n. 5.

### C. The identities of the 30% interest in the Holding Company

■ Plaintiff also alleges that the proxy statement was defective in not disclosing the identities of the buyers representing a 30% interest in the Big Bear Holding Company which owned the stock of New Big Bear. Oppenheimer owns 70% of the Holding Company. It is plaintiff's contention that the identities of all interests directly or indirectly involved in the cash purchase are material since the fairness of the transaction would be evaluated differently by the plaintiff and similar shareholders if the buyers had a particular interest or need to acquire Old Big Bear, or if the buyers were in the same field and had possible antitrust problems that might delay the transaction.

The Court agrees with defendants that such detail in respect to the indirect purchasers was not required in the present context, i. e., a cash offer where the selling shareholders would have no further relationship with the buyers once the sale was completed. The specters of the indirect buyers' special needs or possible antitrust problems are just that. The January 8 and April 19 press releases put out by Brown clearly indicated that the buyers were "private investors who are not engaged in the food business, but are looking at Big Bear solely as an investment." January 8, 1976 News Release, Tierney affidavit, exhibit F. Furthermore, the proxy statement itself indicated (p. 8) that of the shareholders of the Holding Company other than Oppenheimer, "none owns more than 10% of its Common Stock."

Thus the minority indirect interests in the purchasing corporation were investors, and not competitors who might inflict the contrived scourge of antitrust problems on Old Big Bear and its unwary shareholders. Nor can plaintiff demonstrate how a party with less than a 10% interest in an investment could have such a special need for that investment that merely revealing his identity to the sellers would affect the sale price. The investors with Oppenheimer were quite simply offering to make a purchase at a given price which the sellers were free to accept or reject or subject the stock to an appraisal by a Court. It was precisely to discourage such artificial expeditions as this one that the Supreme Court rejected the "might consider important" test of materiality and adopted instead the test of "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *T.S.C. Industries, Inc. v. Northway, supra*, 426 U.S. at 449, 96 S.Ct. at 2132 (1976). The identities of remote minority interests in a cash sale such as the present one do not rise to this level.

### D. The buyers' method of financing the purchase

■ Plaintiff also attacks the proxy statement for failing to disclose the buyers' method of financing the purchase. Plaintiff argues that the shareholders should have been told whether the buyers intended to use the acquired assets as collateral for the purchase. This information is material, according to plaintiff, because it would inform the shareholders of (1) how much of their "own" money the buyers were using, and therefore of (2) how fair their offer was.

Plaintiff's argument implies that it is somehow suspect for a buyer to use an acquired asset as collateral for a loan, or that in so doing the buyer somehow derives a secret benefit to which he is not entitled. A buyer's use of an acquired asset, however, is his own concern. As Judge Friendly recently wrote in *Prudent Real Estate Trust v. Johncamp Realty*, 599 F.2d 1140, 1147 (2d Cir. 1979):

> It is true that, in the case of an 'any or all' offer such as that here at issue, a stockholder who has firmly decided to tender has no interest in the financial position of the offeror other than its ability to pay—a point not here at issue— since he will have severed all financial connections with the target.

Furthermore, even if information about financing were deemed material in this context, it is evident that sufficient disclosure was made. The proxy statement revealed

(pp. 2, 8) that the sale was contingent upon the buyers' securing the necessary financing, commitments for which had already been secured. The same condition was contained in the sale agreement (p. 8). The proxy statement also disclosed (p. 8) that approximately $5 million in Old Big Bear's assets might be used, if necessary, to repay a portion of the financing. Furthermore, the details of the financing were submitted to the S.E.C. by Oppenheimer in a letter dated June 29, 1976 (Colodner affidavit, exhibit D). This was in response to the June 4, 1976 letter from the S.E.C. in which the Commission, after reviewing Old Big Bear's preliminary proxy materials, suggested certain changes in the proxy statement and requested to be informed in a letter of certain details about the financing. The S.E.C. did not request that those details be included in the proxy statement and there is no reason in the statutory proxy obligations for their inclusion.

### E. Old Big Bear's future prospects

[7] Plaintiff next charges defendants with failure to disclose the fact that substantial increases in Old Big Bear's future sales and earnings were anticipated.

But here again, the disclosure was adequate. The financial history of the company over the preceding five years was disclosed in the proxy statement (p. 23). Further, management attributed the recent increase in sales to the opening of new stores (pp. 24, 25), and the Partnership and Management Agreement, which was appended to the proxy statement, disclosed (p. 4) that management's "present intention is to open three stores . . . in each of the five fiscal years ending after the date hereof. . . ."

Financial forecasts or speculations are not required by any statute, case, S.E.C.

rule or regulation. Indeed, it is likely, as defendants argue, that the S.E.C. in 1976 would not have permitted such information in a proxy statement.[6] This aspect of plaintiff's case also falls within this Court's holding in *Rodman, supra*, which the Second Circuit affirmed, saying that "Full factual disclosure need not be embellished with speculative financial predictions." 608 F.2d at 72. Old Big Bear's proxy statement presented full factual disclosure on this point.

### F. Disclosure about the Ohio Company

Plaintiff charges that disclosure about the Ohio Company, the investment banking firm that rendered a fairness opinion about the proposed sale of assets, was inadequate. Specifically, plaintiff alleges that the proxy statement should have disclosed that the Ohio Company had in the past rendered financial advice to Old Big Bear and was an underwriter for $3 million in bonds issued by the town of Ceredo, West Virginia and guaranteed by Old Big Bear.

Again, a review of the proxy materials reveals that there is no merit in plaintiff's allegations. The proxy statement discloses, at page 9, where the fairness opinion is given, that the Ohio Company had already been paid $50,000, that it would receive another $100,000 if and when the shareholders approve the sale of assets, and another $50,000 if and when the transaction is closed. The very next paragraph on that same page reads in full:

> As of July 12, 1976, the Ohio Company owned of record for the account of its customers 21,678 Class A Common Shares of the Company. As of the said date the Ohio Company owned no shares of the Company for its own account, but the officers, directors and principal shareholders of the Ohio Company owned beneficially 5,737 Class A Common Shares.

---

**6.** Defendants point out that in 1976, a note to S.E.C. Rule 14a–9 included "predictions as to specific future market value, earnings or dividends" on a list of what "may be misleading within the meaning of this section." The reference to earnings was deleted from this note, but not until after Old Big Bear's proxy statement was filed with the S.E.C. on May 10,

1976. Furthermore, the "safe harbor" rules exempting projections and forecasts from liability did not become effective until some three and a half years after the issuance of Old Big Bear's proxy statement. See e. g., S.E.C. Release No. 33–6084 [1979] CCH Fed.Sec.L.Rep. ¶ 82,117 (June 25, 1979) (effective July 30, 1979).

The transaction with Ceredo, West Virginia was outlined in note 2, "Long-term debt," to the financial statements in the annual report.

There is a substantial likelihood that a reasonable shareholder, in deciding how to vote, would consider important the information about the Ohio Company's fees and about its holdings of Old Big Bear stock. *See T.S.C. Industries, Inc. v. Northway, supra*, 426 U.S. at 449, 96 S.Ct. 2126 (1976). Plaintiff has been unable to demonstrate that the same can be said about the fact that the Ohio Company had acted as an underwriter on one of Old Big Bear's past financial transactions. In light of the disclosures made, such information would add nothing material to the "total mix" of information available to the shareholders evaluating the Ohio Company's fairness statement.

### G. The alleged "manipulation"

█ Finally, plaintiff alleges that Old Big Bear publicly announced that it was involved in discussions relating to a possible sale, but delayed the release of the company's fiscal 1976 results "in order to manipulate and depress Old Big Bear's stock."[7] This claim is without merit for three independent and compelling reasons.

First, defendants' announcements were timely and proper. Defendants argue, and plaintiff does not dispute, that public announcement of the sale discussions was required by American Stock Exchange Company Manual §§ 401, 402(1), and 403(1). In addition, on March 2, 1976, Old Big Bear released its estimated sales for the quarter and the year ending February 28, 1976. This release estimated that total sales for the year would be up 10.8% to approximately $322.9 million. When the certified financial statements for 1976 were released on April 22, 1976, they showed actual sales of $319,004,860, some three million dollars less than the March 2 estimate. As counsel for Oppenheimer pointed out at oral argument, the estimated sales for the period ending February 28 could not be released much before March 2, and if the directors were trying to conceal Old Big Bear's favorable financial picture, they would probably not have overestimated the year's sales by approximately three million dollars.

The second reason that this claim lacks merit is that the announcements would not have had the effect ascribed to them by plaintiff since the sale of assets was contingent upon approval of the majority of holders of each class of stock and 90% of the Class A Common Shares were held by the public. The publication of the sales results occurred on March 2nd; the agreement on the sale price of $33 was tentatively made on April 19th; the certified figures were published April 22nd; the sale agreement was signed June 30th; the fourth quarter results were announced July 6th; the proxy statement with the figures issued on July 24th and the stockholders' approval occurred on August 16th. Therefore it was fully within the power of the public shareholders' with full information before them to vote down the proposed sale. Plaintiff has not shown, and cannot show, how the announcement of an offer at a certain price can freeze the market price of the stock at or below that price.

The third reason that this claim is meritless—if another be needed—is that plaintiff has ignored the availability of state court appraisal proceedings. The proxy statement advised the shareholders that if they were dissatisfied with the offered price, they could seek a court appraisal of the value of their shares. An appraisal would have provided for anyone who sought it (which plaintiff did not) the fair value of the shares, free from any alleged manipulation or suppression of value by the defendants.

The structure of the transaction did not give any insider benefits at the expense of the corporation or its other stockholders. The benefits to each stockholder were per-

---

7. Plaintiff has abandoned any claim for technical "manipulation." See note 1, *supra*. Accordingly, the argument that plaintiff has attempted to preserve on this set of facts must be treated as a matter of nondisclosure, as has been argued by counsel for plaintiff.

sonal to himself and did not trench on the rights or expectancies of any other holder. The issue in such cases is not what each holder gains from a corporate transaction, but whether the transaction was intrinsically fair to the corporation and whether any other holder has been deceived to his injury. Here there was neither deception nor injury, and the transaction was *prima facie* fair according to expert opinion furnished. Any error in the value payable under the plan was fully subject to state court appraisal rights by any dissenter. The plaintiff in this case was fairly informed of the matters material to his available courses of action and elected to be bought out at $33 a share, the highest price for the stock in several years.

There is no obligation to continue a state chartered business or powers if the requisite majority of stockholders decide not to do so. Neither the S.E.C. nor a minority stockholder may deter a corporation on a valid vote of its shareholders from a substantial change in the nature of the investment of public shareholders. The S.E.C. may not arrogate any contrary power to itself. State law does not interdict such changes and it is state law that controls incorporation and changes in charter purposes. There is no implied promise by any corporation that it will not change the nature of its business.

 In conjunction with the submission of his Local Rule 9(g) statement, plaintiff has requested that, should the Court be disposed to grant the defendants summary judgment on the present record, such judgment be held in abeyance to allow plaintiff to conduct discovery in order to present facts sufficient to justify denial of the motions. Plaintiff invokes Fed.R.Civ.P. 56(f), claiming that information he needs is within the exclusive knowledge of defendants.

Plaintiff's request is denied. This Court has determined on the basis of documentary evidence that the disclosure in the questioned proxy statement was neither false nor misleading. Further discovery by plaintiff cannot add to or subtract from what was disclosed in the proxy statement

and Annual Report, nor show to be material that which the Court has found to be immaterial at all events.

Similarly, the naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.

*Spiegler v. Wills*, 60 F.R.D. 681, 683 (S.D. N.Y.1973) (Pollack, J.)

Having carefully examined the proxy materials and having found no material omission, misrepresentation, or deception, the Court finds it unnecessary to address defendants' other arguments for dismissal, namely that the complaint fails to plead fraud with sufficient particularity under Fed.R.Civ.P. 9(b), or that plaintiff has proceeded under the wrong sections of the securities laws.

As we have heretofore had occasion to say in an apposite connection, *Christophides v. Porco*, 289 F.Supp. 403, 406 (S.D.N.Y. 1968) (Pollack, J.):

The complaint herein is representative of a growing number of 10b–5 suits brought in this Court on unique, esoteric and implausible legal theories. Innovation is not to be discouraged, nor the imaginative instinct dulled. However, claims cloaked in a tissue of confusion devoid of federal jurisdiction or legal merit, impede rather than foster progress in the field of investor protection.

The defendants are granted summary judgment dismissing the complaint against them in its entirety, with costs.

So Ordered.