**Lucy S. BEEBE, individually, and on behalf of all other common shareholders of Pacific Realty Trust, Plaintiff,**

v.

**PACIFIC REALTY TRUST, et al., Defendants.**

**Civ. No. 83–228–PA.**

United States District Court, D. Oregon.

Jan. 12, 1984.

Henry Kantor, Henry A. Carey, P.C., Portland, Or., John D. Ryan, John D. Ryan, P.C., Portland, Or., Roger G. Tilbury, Portland, Or., for plaintiff.

Barnes H. Ellis, Gregory R. Mowe, Peter R. Jarvis, Susan K. Eggum, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for defendants Pacific Trust Realty, Peter F. Bechen, James F. Kavanagh, Merritt W. Truax, William W. Wyse and Stoel, Rives, Boley, Fraser & Wyse.

Garr M. King, Kennedy, King, Zimmer & O'Malley, Portland, Or., for defendant Alex. Brown & Sons.

Hugh Steven Wilson, Susan E. Nash, Latham & Watkins, Los Angeles, Cal., Verne W. Newcomb, Wayne D. Landsverk, Newcomb, Sabin, Meyer & Schwartz, Portland, Or., for defendants Kohlberg, Kravis, Roberts & Co., KKR Associates, and PRT Holding Co.

Donald W. McEwen, McEwen, Newman, Hanna & Gisvold, Portland, Or., for defendant Tonkon, Torp, Galen, Marmaduke and Booth.

## OPINION AND ORDER

PANNER, District Judge.

This is a securities fraud class action challenging the leveraged buyout of Pacific Realty Trust ("PacTrust") by affiliates of Kohlberg, Kravis, Roberts & Co. ("KKR"). The case has travelled far in a relatively short time. On October 1, 1982, Peter Bechen, PacTrust's president and chief executive officer, telehoned KKR's Jerome Kohlberg and asked him to buy the company. Six weeks later, PacTrust and KKR struck a deal. ("Agreement and Plan of Exchange," November 15, 1982; Proxy Statement, pp. A–2 to A–22.) The Proxy Statement was mailed to approximately 1,500 shareholders on January 21, 1983. They approved the transaction on February 16, 1983. Two days previously, Lucy S. Beebe filed this action. On August 4, 1983, I certified a class. *Beebe v. Pacific Realty*

*Trust,* 99 F.R.D. 60 (D.Or.1983). The parties waived a jury and trial to the court occurred October 4–7, 1983.

Plaintiff sought certification of a broad class and numerous claims. I certified a class under Fed.R.Civ.P. 23(b)(3)

consisting of all persons who beneficially owned shares of PacTrust common stock on February 16, 1983, except the following: (1) persons who purchased such shares on or after November 16, 1982; (2) APCI [APC Investments, Inc.] and its affiliates; and (3) defendants herein, their spouses, children, nominees, representatives, heirs, and any other persons or entities within the domination or control of such persons.

*Id.* at 74. I further ordered that class action status would apply only to plaintiff's causes of action under sections 10(b), 14(e), and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e), and 78t(a), and the Oregon securities laws. *Id.* Plaintiff pursued her individual federal claim under section 18(a) of the 1934 Act, 15 U.S.C. § 78r(a), and her pendent state claims of common law fraud and negligent misrepresentation, in this action.[1] Plaintiff withdrew her claims for injunctive relief and indicated that she primarily sought damages. With the agreement of all parties, I bifurcated for subsequent trial the issue of damages.[2] The declaratory relief requested is a determination that the Proxy Statement is defective as a matter of law.

Plaintiff's complaint accused PacTrust, four of its former trustees, two Oregon law firms, an investment banker, and KKR and two affiliated entities of wilfully and intentionally defrauding plaintiff and the other PacTrust shareholders. She specified 28 misstatements in or omissions from the Proxy Statement. (Pretrial Order, Plain-

tiff's Contentions of Fact, Nos. 5 and 6.) In addition, plaintiff suggests the Pac-Trust-KKR transaction was a conspiracy. She refers to alleged improper "schemes," "plans," "motives," and "strategy" of the defendants. (*See, e.g., id.,* No. 21.) She is dissatisfied with the price she received for her stock. I find the Proxy Statement fully, fairly, and accurately disclosed all material facts and hold for the defendants.

## LEGAL STANDARDS

The gravamen of plaintiff's case is misrepresentation or nondisclosure of facts in the Proxy Statement. To be actionable under the federal securities laws, first there must be a misrepresentation or nondisclosure and second it must be *material* under the standard specified by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).[3] This standard applies to claims brought under the Oregon securities laws as well. *See Everts v. Holtmann,* 64 Or.App. 145, 151, 667 P.2d 1028, 1033 (1983); O.R.S. 59.135(2); 59.-127(1)(b). I have previously articulated that standard as "whether there is a substantial likelihood a hypothetical reasonable PacTrust shareholder would have considered any omitted or misrepresented fact to have actual significance in deliberating whether to vote to approve the KKR transaction." *Beebe,* 99 F.R.D. at 66 n. 2.

## BACKGROUND AND APCI THREAT

PacTrust is a business trust established under Oregon law in 1972. Its investments consist primarily of equity interests in real property located in Oregon and Washington. Completed equity investments include eight business parks with 48 build-

---

1. On August 26, 1983, I permitted James L. Holland to intervene as a member of the class, to seek relief only under class-wide claims.

2. I also left for resolution at the second trial the extent to which defendants could attempt to rebut the "presumption" of causation which would be created by plaintiff's proof of a material misstatement in or omission from the Proxy Statement. *Cf. Beebe,* 99 F.R.D. at 68–70.

3. The purpose of requiring proof of the misstatement or omission of *material* facts is to strike a balance so that facts the shareholders need for an informed decision are disclosed and not covered up by endless detail. *TSC Industries,* 426 U.S. at 448–49, 96 S.Ct. at 2132.

ings, 11 free-standing industrial buildings, one office park, and eight office and commercial properties. Industrial space is leased to tenants for light manufacturing, warehousing, sales, distribution, service, showroom or office purposes. The company holds approximately 200 leases.

PacTrust was organized as a real estate investment trust ("REIT") under sections 856–860 of the Internal Revenue Code, 26 U.S.C. §§ 856–860. In general, since PacTrust distributed at least 95 percent of its "real estate investment trust taxable income" to its shareholders each year, it was not taxed on that portion of its taxable income distributed to shareholders. Oregon tax laws also permitted PacTrust to take as a deduction the full amount of the deduction allowed under Federal tax laws for such distributions.

The KKR proposal emerged largely because PacTrust's board of trustees decided to sell the trust. The main reason for their decision was the continuing threat of a "two-step" tender offer which would leave minority shareholders in a very disadvantageous position. I find the Proxy Statement's "Summary" accurately described the background of the KKR plan:

In November 1981, APC Investments, Inc. ("APCI") commenced a tender offer to increase the ownership of PacTrust's shares held by it and its affiliates from less than five percent to 51 percent. PacTrust's Board of Trustees determined that this tender offer was not in the best interests of shareholders and unanimously recommended that shareholders reject the tender offer. The Trustees also adopted a Bylaw restricting a person from owning more than 9.8 percent of the Trust's shares. The Trust obtained a state court ruling upholding the Bylaw in November 1981; a permanent injunction against the tender offer was obtained from a federal court in December 1981. APCI appealed both decisions.

During the period following the APCI tender offer, the Board of Trustees explored and investigated certain types of transactions, including the possible acquisition of the Trust or one or more of its properties by another party, a business combination between PacTrust and another company, or liquidation of the Trust .... In the opinion of PacTrust's management, all of the discussions were unsatisfactory because the potential purchaser either (i) wanted to acquire only a portion of the Trust's shares, (ii) was unable to provide assurances that it could obtain financing to acquire all the shares, (iii) was interested only in a merger or asset purchase transaction which would require a shareholders meeting and would not meet the time constraints imposed upon the Trust by the tender offer, or (iv) declined to make a firm offer.

In October 1982, following reversal of the trial court's decision that PacTrust's Bylaw limiting large accumulations of shares was valid, management again contacted a number of parties regarding their interest in PacTrust. Through October and early November 1982, Peter Bechen, President and a Trustee of PacTrust, had discussions with representatives of KKR regarding the possible acquisition of PacTrust by a company to be organized by KKR. On November 2, 1982, representatives of KKR made an oral proposal to a special meeting of PacTrust's Board of Trustees. KKR said it was prepared to arrange for the acquisition of all of PacTrust's shares for $38 in cash per share. Although KKR expressed a desire that PacTrust's management participate in the proposed transaction as investors and employees of the acquiring company, KKR's proposal was not conditioned on any such management participation. The Board of Trustees then established a special committee, consisting of James F. Kavanagh (Chairman). John R. Olsen and Merritt W. Truax, all of whom are outside Trustees of PacTrust (the "Special Committee"), to consider the KKR proposal. On November 5, 1982, the Special Committee met with representatives of Alex. Brown & Sons ("Alex. Brown"), an investment banking firm and financial adviser to the

Trust, to discuss KKR's proposal. Alex. Brown advised the Special Committee that the proposal was fair to PacTrust's shareholders .... The Committee unanimously voted to recommend to the Board of Trustees that the price of $38 per share be considered an adequate price for PacTrust's shares. During further negotiations on November 8, 1982, KKR agreed to increase the price per share from $38 to $38.50. PacTrust agreed to pay no dividend until March 31, 1983. PacTrust's quarterly dividend for January 1983 was expected to be $.40 per share.

The Special Committee met on November 15, 1982 and recommended that the Board of Trustees approve the Agreement. The Board of Trustees met following the Committee meeting and authorized execution of the Agreement. John R. Olsen abstained from voting on the KKR offer at both meetings. The Agreement was executed by PacTrust and Holding [PRT Holding Co.] on November 15, 1982 ....

...The Board of Trustees recommends approval of the Agreement by the shareholders of PacTrust .... The Board was influenced by the expressed desire of numerous shareholders to realize the true value of their shares in a cash transaction. The Board was aware that this shareholder attitude had intensified during the year since the APCI tender offer. The Trustees also considered a number of factors, including the recent and historical market prices and trading volume of the Common Shares, the Board of Trustees' knowledge of the business, operations, properties, assets, earnings and prospects of PacTrust, the estimated liquidation .value of the Common Shares, the prevailing condition of the real estate market in the Pacific Northwest, the lack of other firm offers equal to or greater than $38.50 per share, the cost of defending against and risks presented by unfriendly takeover attempts, the opinion of Alex. Brown, attached to this Proxy

Statement as Exhibit II, and the factors discussed in the opinion ....

(Proxy Statement, pp. 4–5.)

The Proxy Statement later correctly amplified its discussion of the APC Investments ("APCI") proposal:

The APCI offer was for $37 net in cash per share and contemplated, among other alternatives, a second-step merger in which the remaining PacTrust shareholders would receive cash or securities of APCI or an affiliated company.

... PacTrust's Board believed that acquisition of 51 percent of PacTrust's shares by APCI would be likely to terminate the Trust's favorable REIT tax status. Maintenance of the Trust's REIT status is important to avoid double taxation, once at the Trust level and once at the shareholder level upon payment of dividends .... In addition to the possible disqualification of the Trust as a REIT, the Trustees were concerned that the second-step merger, if consummated, would be inequitable to PacTrust's remaining shareholders. Furthermore, Alex. Brown & Sons ... advised the Board of Trustees that the $37 cash price was grossly inadequate from a financial point of view ....

....

Even after PacTrust was successful in initially enjoining the tender offer, management continued to seek and hold discussions with parties for the possible acquisition of PacTrust. This was done because APCI had appealed the trial court decisions which temporarily halted the tender offer and the decisions were subject to reversal at any time. Reversal of the decisions would allow APCI to revive the tender offer. PacTrust's primary objective was to find a party that would make a tender offer for all the shares of the Trust at a price higher than $37 per share so that all shareholders would benefit equally ....

....

On September 29, 1982, the Oregon Court of Appeals reversed the trial court's decision that the PacTrust ByLaw

limiting large accumulations of shares was valid ....

At this point, APCI's tender offer still remained subject to the federal court injunction and certain disclosure issues had to be resolved before APCI could resume its tender offer. PacTrust anticipated that the APCI tender offer would be resumed soon or another unfriendly tender offer initiated ....

....

On October 20, 1982, APCI withdrew its tender offer .... Despite withdrawal of the tender offer, APC [American Pacific Corporation], the controlling shareholder of APCI, made a filing with the Securities and Exchange Commission on November 2, 1982 in which it stated that it had acquired over five percent of PacTrust's Common Shares and that it might seek to gain control of PacTrust. Because APCI was unwilling to state to the United States District Court for the District of Oregon that it would not renew its tender offer during the next year, the court on November 15, 1982 extended the permanent injunction regarding the APCI tender offer to November 15, 1983.

In November 1982, APC solicited proxies in opposition to a proposal of PacTrust's management in its proxy statement for the annual meeting of shareholders that PacTrust's Declaration of Trust be amended to limit large accumulations of shares. The proposed amendment was similar to the Bylaw which had been declared invalid by the Oregon Court of Appeals. At the December 1, 1982 annual meeting, the proposal was approved over APC's objections .... PacTrust is unable to predict what the future plans of APCI and APC are with respect to the Trust.

(*Id.*, pp. 10–12.)

Defendants include Peter Bechen, James Kavanagh (former chairman of the board), William Wyse (former secretary), and Merritt Truax, all former members of the board of trustees. The only former board member not named was John Olsen. Plaintiff alleges the trustee-defendants had im-

proper motives for seeking KKR as a buyer. She further contends APCI was not the threat the board portrayed.

The APCI offer was two-step in nature. APCI proposed to obtain the majority interest in the Trust at $37 per share. There was a high likelihood this would be followed by a merger of the minority interest into APCI on terms disadvantageous to the minority. The evidence supporting the trustee's belief that this would be so is accurately summarized in the Defendants' Post-Trial Brief, pp. 32–34.

In addition, APCI intended to "de-REIT" PacTrust. (*See* Exhibit 1013, pp. 7–8.) This would have been a serious injury to the minority shareholders left in the de-REITED trust.

Also, the control block of APC's shares had been pledged to American Financial Corporation of Cincinnati. (*See* Exhibit 1003, p. 12000656.) There was evidence that this company was unsavory. (*See* Exhibit 1013, p. 5.) Thus, the PacTrust minority were in danger not only of APC but also of American Financial Corp. and its controversial chairman, Robert D. Linder. (*See* Bechen testimony, II Transcript, pp. 266–67.) There were other causes for concern by the PacTrust board in the history of past transactions involving APC. (*See* Defendants' Post-Trial Brief, pp. 35–36, and evidence cited therein.)

APCI's threat was real at the time PacTrust and KKR negotiated the Agreement and Plan of Exchange. On the very day that contract was executed, I extended my injunction against the APCI tender offer. After the shareholders changed the Bylaws two weeks later, the threat diminished. The Proxy Statement disclosed that fact:

Subsequent to the Trustees' approval of the Agreement, PacTrust has become less vulnerable to unfriendly takeovers as a result of adoption of the Declaration of Trust amendment by its shareholders on December 1, 1982. However, the amendment is subject to challenge in court, and the Trust could still be required to expend large amounts of funds

in an effort to enforce it in a takeover situation. (Proxy Statement, pp. 15–16.) In addition, APCI or another entity could seek a vote changing the Bylaw provision.

It is clear that after the APCI tender offer, PacTrust needed a "white knight." The evidence demonstrated that many shareholders, including the larger ones, had become convinced the Trust should be sold.

## DISCUSSION

### I. VALUATION.

#### A. *Fairness Of The Price.*

Plaintiff contends that $38.50 per share offered by KKR was not a fair price for the stock and that the defendants knew that it was not a fair price.

Plaintiff relies heavily on evidence of the value of the underlying assets. While the value of the underlying assets is a factor in determining the fair market value of the stock, it is of questionable assistance under the circumstances in this case. It is inappropriate to total the value of the underlying assets, subtract the liabilities, and divide by the number of shares of stock to arrive at the value per share of stock. The underlying assets included numerous real estate holdings, rentals, and properties under development. It is extremely difficult to estimate the cost associated with liquidation. Substantial time periods would have been involved and key personnel would have been lost as the operation was liquidated. The difficult economic conditions that existed, the tax consequences, and the uncertainties with respect to the amount available for distribution to stockholders discouraged that approach.

The testimony of Mr. Oliver, a vice president of Alex. Brown & Sons ("Alex. Brown"), was impressive. His is one of only two or three firms in the United States who are experts in analyzing real estate investment trusts. He was employed immediately after the hostile tender offer by APCI in 1981 to give a "fairness" opinion on the $37.00 per share APCI offer.

He concluded that price was "grossly inadequate" for 51 percent of the stock. He felt that $45.00 per share should be the highest "asking" price even though the net equity of the Trust's underlying assets might be substantially higher. Alex. Brown determined that $38.50 was a fair price for all of the stock approximately one year later. The reasons he gives for the two apparently contradictory fairness opinions are persuasive and I accept them. The stock was exposed to an active and efficient market from the time of the APCI tender offer until the vote by the stockholders. The stock was publicly traded. The highest price on the market before the tender offer was $33.75 per share. After the tender offer, it dropped down to $22⅝ per share. It never reached a price of $38.50. No other offers could be found as favorable as the KKR offer.

As I have found, the APCI tender offer represented a real threat. Management and the directors had a legitimate concern that acquisition by APCI of 51 percent of the stock with the resulting control would jeopardize the company's tax status as a real estate investment trust and subject the remaining stockholders to a captive status. APCI declined to agree to purchase all of the stock at the tender offer price of $37.00 per share. Directors and management acted properly in attempting to defeat the hostile tender offer and, in fact, had a duty to do so. They aggressively sought a "white knight" and explored the market.

Much of plaintiff's evidence on value related to the opinions of management, its consultants, and the board members. As might be expected in an organization of this type, opinions varied not only from individual to individual but from time to time. Market exposure and the inability to find another "white knight" from the time of the APCI tender offer to the time of the contract with KKR undoubtedly affected evaluation opinions. Alex. Brown had a real motive to market the stock with a substantial commission as a reward. Man-

agement also had a motive in light of the hostile tender offer and the expressed desire of many of the shareholders to sell and avoid the risk of a successful takeover by APCI. Alex. Brown, management, and the directors all worked diligently to find a buyer thereby exposing stock to the market.

■ I find that defendants recommended the price of $38.50 solely because they believed it was in the best interest of the stockholders and not because of any self-interest or other motive. I find no fraud, bad faith, deceit, or manipulation. I am satisfied that it was an arms-length transaction and that the price of $38.50 per share equaled or exceeded the fair market value of the stock. *Cf. Popkin v. Bishop*, 464 F.2d 714, 717–18 (2nd Cir.1972) (fairness of exchange ratios in merger not actionable under Rule 10b–5); *Gaines v. Haughton*, 645 F.2d 761, 779 n. 33 (9th Cir.1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982) (breaches of fiduciary duty not actionable under federal securities laws).

### B. *Rule 14a–9.*

■ The absence of fraud, bad faith, deceit, or manipulation does not resolve plaintiff's allegations with respect to alleged violations of Rule 14a–9, 17 C.F.R. § 240.14a–9. Neither are these allegations resolved by a determination that the price obtained upon the sale was fair. Rule 14a–9 is violated if a proxy statement misrepresented or failed to disclose a material fact. A misrepresentation or an omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSI Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. Or stated another way, there must be a substantial likelihood that the disclosure of the misrepresentation or the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the "total mix" of information made available. *Id.*, 96 S.Ct. at 2132. PacTrust's stockholders were entitled to make an informed decision on the

KKR proposal. It is therefore necessary to analyze the Proxy Statement to determine whether it contained any untrue statement of material fact or omitted to state any material fact necessary in order to fairly present the matter to the stockholders. I will analyze each of plaintiff's contentions with respect to the issue of valuation.

### C. *Contention: The Proxy Statement Failed To Disclose That In November, 1981, Defendant Alex. Brown Had Valued PacTrust Stock At Between $49–$56 Per Share.*

■ I accept the testimony of Mr. Oliver, as confirmed by the exhibits, that Alex. Brown did not make an evaluation on a per share basis of the PacTrust stock in November, 1981. It was only asked to give, and it only gave, a "fairness" opinion on the APCI tender offer of $37.00 per share for 51 percent of the stock. A "fairness opinion" has an accepted meaning and it does not include a determination of what the fair market of the stock is. That opinion was fully disclosed. Their workpapers reflected a range of $49 to $56 million as the net equity of the Trust in 1981. Those workpapers were not disclosed to management, the directors or to anyone else. (*See, e.g.,* Olsen testimony, III Transcript, p. 118; Booth testimony, VI Transcript, p. 30.) They did not make an appraisal to support that estimated range of values. As previously noted, the value of underlying assets is only peripherally related to the stock value. In November, 1981, Mr. Oliver felt that the maximum "asking" price to try to find a "white knight" was $45 per share. After extensive efforts, Alex. Brown was never able to get an offer at that price.

In any event, the 1982 workpapers with respect to the KKR proposal showed a substantially reduced estimated value of underlying assets because of sales and deteriorating market conditions. (Exhibits 1140 and 1145.) It would not have been appropriate to include in the Proxy Statement this estimated range of asset values as of November, 1981, and it could not

have been viewed by the reasonable shareholder as having significantly altered the "total mix" of information made available.

D. *Contention: The Proxy Statement Failed To Disclose That Bechen Had Valued PacTrust Stock At Between $35–54 Per Share In 1981 And 1982.*

■ At the time of the APCI tender offer, it is clear that Mr. Bechen believed the stock had a value in excess of $37. He expressed to Mr. Oliver that $45 per share was a "minimum" sales price even though Mr. Oliver was urging $45 as a maximum. He testified in November of 1981, during a court hearing in the APCI litigation, that he believed a pro rata liquidation distribution would bring substantially in excess of the $37 per share figure to the shareholders. From that time up until the conclusion of the transaction with KKR, there was a concentrated but unsuccessful effort to market the stock, as revealed in the Proxy Statement. Mr. Kovack testified that he recalled Mr. Bechen had expressed the opinion in 1981 that "[Bechen] believed firmly that the Trust probably had a value up to $50 a share, perhaps." The qualifying "perhaps" indicates the unreliability of including such an opinion in the Proxy Statement. In any event, this was before the lengthy and active exposure of the stock to the market. I believe shareholder Phil Jackson was in error in recalling that Mr. Bechen advised him to "buy all you can. That's what I'm doing. It's worth $54 instead of the $37 APCI is offering for it." Mr. Jackson recalls that this conversation took place in September of 1982 and I am satisfied he is in error. It could have occurred about the time of the APCI offer. By September, 1982, however, there was no reason for Mr. Bechen to believe, and I am satisfied that he did not believe, that the stock was worth $54 per share. I found Mr. Bechen to be an accurate and reliable witness. I am satisfied that he was completely honest and that he was neither buying stock nor telling stockholders that he was buying stock in September of 1982.

Plaintiff's characterization that Mr. Bechen confirmed the $53 per share value on December 1, 1982, during the annual meeting of stockholders is completely erroneous. The statement upon which plaintiff relies, exhibit 94, was in response to an APCI letter to shareholders dated November 19, 1982. It is very clear from that statement that the reference to $53 per share was based upon the use of assessors' valuations of properties which were reported in each of the last four PacTrust annual reports. At the same point in that speech, Mr. Bechen pointed out the reduction in those assessed values and the fallacy of accepting those values in light of the long-term leases on the properties. He also points out that those same assessed values had been disclosed in the preparation of the annual statements for each of the past four years. The Proxy Statement also discloses such assessed valuations.

In light of the disclosures in the Proxy Statement, there is no substantial likelihood that the opinions of Mr. Bechen would have been viewed by the reasonable shareholder as having significantly altered the "total mix" of information made available.

E. *Contention: The Proxy Statement Misled The Shareholders By Partially Disclosing The $78.8 Million Preliminary Appraisal By Curtis, MacKenzie & Slocum ("CMS") Without Disclosing That Deduction Of Liabilities Would Have Resulted In A Per Share Value Of Approximately $45.*

■ Curtis, MacKenzie & Slocum ("CMS") was engaged under time pressure to assist the trustees in determining the valuation of PacTrust's real properties in response to the APCI tender offer in November, 1981. This was in the event the trustees decided to liquidate the Trust rather than sell to one purchaser under the time constraints imposed by a tender offer. CMS did not do a formal appraisal with a study of comparable sales and a detailed physical review of the properties, but simply did a tentative cash flow review. (*See*

Booth testimony, VI Transcript, p. 17. *See also* Olsen testimony, III Transcript, p. 125.) On the strength of that preliminary work, CMS estimated the gross value of the Trust properties on November 17, 1981, at $78.8 million. The Proxy Statement at page 20 accurately discloses the nature of that estimate. Plaintiff contends that the Proxy Statement should also have disclosed that a deduction of liabilities as of May 31, 1982, would have resulted in a net value of over $45 million, or $45 per share. The Proxy at page 19 in the table shows various methods of evaluating the Trust properties including costs, PacTrust evaluation of completed equities, book value of completed equities (cost less depreciation), and true cash value as determined by the county assessor's offices. The table shows a computation on a per share basis based upon not only book value but upon the PacTrust evaluation of completed equities. This computation is made only after and immediately preceding caution warnings as follows:

(1) PacTrust evaluations were not reviewed by independent appraisers.

(2) No allowance was made for book sale discounts which would be involved in the sale of all properties to one purchaser.

(3) Disposition costs were not considered.

(4) Taxes which might be payable by the trust or its shareholders were not considered.

Had the calculation been made on page 20 that plaintiff suggests, it would have been necessary to repeat the cautions. On the other hand, any stockholder placing credence in the figure of $78.8 million could easily have inserted that figure into the table on page 19 and arrived at $45. The same calculation could have been made by subtracting the liabilities from the May 31, 1982, balance sheet on page 50 of the Proxy Statement. In any event, the difference between $45 per share and the $43.67 per share in-house appraisal which was disclosed, *see* section I.G. *infra*, cannot be considered to alter the "total mix" of information available when so many other factors are involved in evaluating the market value of the stock.

The following factors were considered by investment banker Alex. Brown in determining the fairness of the Exchange:

(1) the value of the Trust's assets (the real property and mortgage loan portfolio);

(2) the vulnerability of the Trust as a takeover candidate;

(3) the deteriorating economic conditions in Oregon in the previous 12 months, which made obtaining capital for the Trust more difficult;

(4) the market action of the Trust's stock in comparison to the market price and market activity of the securities of other REITs;

(5) the dividends paid on PacTrust's shares compared to securities of other REITs;

(6) the low trading volume in the Trust's shares, which made it difficult for larger shareholders to dispose of their holdings if they so desired;

(7) the lower current interest rates, beneficial to the Trust because with lower interest rates investors are satisfied with a lower yield on their shares;

(8) review of previous negotiations with respect to the sale of PacTrust to other parties; and

(9) the "opportunity cost" to PacTrust's shareholders of not accepting the $38.50 per share proposal compared to using the proceeds to make other investments with less risk than investment in the Trust. (Proxy Statement, p. 18.)

The Proxy contains considerable and significant information with respect to many of these items. I cannot conclude that there is a substantial likelihood that the mathematical calculation plaintiff seeks would have been viewed by the reasonable shareholder as having significantly altered the "total mix" of information made available.

F. *Contention: The Proxy Statement Misled The Shareholders By Failing To Explain That PacTrust Earnings In The Period Between The "Grossly Inadequate" Tender Offer Of $37.00 Per Share And The "Fair" Price Of $38.50 Per Share Far Exceeded The $1.50 Per Share Difference In The Offers.*

The Proxy Statement at pages 5–6 emphasize the variety of reasons considered by the trustees in recommending a favorable vote to receive $38.50 in cash for each of the outstanding common shares. No emphasis is placed upon the fact that a $1.50 increase is significant. Emphasis is placed upon the fact that the overall return to all shareholders is of substantially more value than the APCI offer because of the fact that the APCI offer was only for 51 percent of the Trust shares. The Proxy points out that such an overall return to shareholders was likely to be considerably less than $37.00 per share. The Proxy further emphasizes a decline in the price that qualified buyers of real estate were willing to pay for income-producing properties from the early fall of 1981 to the time of the Proxy. The Proxy at page 13 fully discloses the explanation of adjustment of the purchase price from $38.00 to $38.50 based upon elimination of dividends. The earnings statements and the dividend information were fully disclosed. This contention is without merit.

G. *Contention: The Proxy Statement Misled The Shareholders By Disclosing The In-House Appraisal Of $43.67 Per Share Without Explaining Material Facts Which Would Affect A Shareholder's Understanding Of The Appraisal.*

██ Once again the plaintiff relies heavily on estimates of the value of underlying assets. The Proxy Statement makes it clear that Trustees recognize that the liquidation value of the Trust might be greater than the $38.50 per share price offered by KKR and pointed out the problems with such a liquidation. (*Id.*, p. 16.)

Plaintiff correctly argues that the in-house evaluation of $43.67 per share as set forth in the table on page 19 of the Proxy was probably conservative through 1981. However, decreasing assessed valuations, and a continuing decline in the real estate market, indicate that the in-house appraisals used in the Proxy for 1982 are probably not conservative. The testimony is persuasive that there was no improvement in the Portland market for industrial real estate throughout 1982. PacTrust anticipated about a 26 percent turnover in tenants in 1983. While interest rates were falling, this represented a break in inflation which deflated real estate values. The declining interest rate had no effect on the capitalization rate and real property values continued to decline through 1982. This contention is without merit.

H. *Conclusion.*

The Proxy Statement makes a full, adequate, and complete disclosure with respect to the question of valuation. I find there are no misrepresentations or material omissions. It is clear that a number of stockholders felt that the price of $38.50 per share was too low. Those persons who prepared the Proxy Statement were aware of stockholder pressure to sell, knew that litigation could be expected (*see* Booth testimony, VI Transcript, p. 18), and had no motive other than to make certain that there was a full and accurate disclosure. A reading of the Proxy makes it clear that they succeeded.

II. ECONOMIC CONDITIONS.

Plaintiff contends the Proxy Statement made material misstatements and omissions regarding economic conditions in the Pacific Northwest. Specifically, plaintiff contends there was a "gloomy economic projection in the proxy solicitation" which was "untrue and unfair." (Plaintiff's Itemized Submission of Contentions, p. 10.)

Plaintiff misconstrues the references to "deteriorating economic conditions" in the Proxy Statement. The Proxy said:

A majority of the Trustees recommends approval of the KKR offer despite the Board's characterization of the November 1981 $37 per share APCI tender offer as grossly inadequate. Their recommendation is based in part upon the fact that the APCI offer was for only 51 per cent of the shares, with the overall return to all shareholders likely to be considerably less than $37 per share .... Another important reason for the difference in the Trustees' views on the two offers is the decline in the price that buyers of real estate were willing to pay for income-producing properties from the early fall of 1981 to the present time .... The decline in real estate prices *since late 1981 has been* the result of *deteriorating economic conditions*, gradual lessening of the expectation of high rates of inflation, and high mortgage interest rates or the expectation of high mortgage interest rates in the future. All these factors have made alternative investments more attractive and have made it more difficult to finance the acquisition of large real estate investments through borrowing from establishing lenders.

(Proxy Statement, p. 16, emphasis added.) A similar statement was made in the Proxy Statement's "Summary." (*Id.*, p. 6.) In addition, the January 17, 1983, fairness opinion of Alex. Brown stated:

We recognize that on November 8, 1981 we furnished to you an opinion in which we indicated that the proposed price of $37.00 cash per share then being offered for up to 454,000 shares pursuant to a tender offer by APC Investments, Inc. was grossly inadequate. An offer to pay $38.50 cash per share for all of the shares of PacTrust is of substantially greater value to the shareholders of PacTrust as a group than an offer to pay $37.00 for approximately fifty percent of the shares .... Furthermore, more than a year has passed since the date of our earlier opinion. As a result of *deteriorating economic conditions during that period,* the value which qualified investors would attach to property of the magnitude of the properties owned by PacTrust has declined.

(*Id.,* appendix II, p. 2, emphasis added.)

The Proxy Statement's language regarding deteriorating economic conditions is in the context of listing just one of several factors explaining why real estate prices had declined since 1981. In turn, declining price was just one of several factors explaining the basis for the trustees' decision to recommend shareholders accept $38.50 per share in 1983 in light of their opinion in 1981 that $37.00 per share for 51 percent of the stock was "grossly inadequate." The reference is not a projection that economic conditions affecting PacTrust would continue to deteriorate. In fact, the Proxy Statement declares:

The PacTrust Board recognizes that consummation of the Exchange would deprive the Trust's shareholders of an opportunity to continue their interest in PacTrust as an ongoing business with potential future growth. In this connection, the Board considered the trend of increased operating income during the last five years ended May 31, 1982 and the Trust's results of operations for the six months ended November 30, 1982 as well as future forecasts of income and cash flow during the balance of fiscal 1983 .... Although there can be no assurance, the Board expects the trend ·of increased operating income to continue. The Board also considered the possibility of a turnaround in the general economic climate in the pacific Northwest in the future and the recent and possible future decline in interest rates. The Board believes, however, that these factors were adequately taken into account in reaching its determination that the Exchange is in the best interests of and is fair to PacTrust's shareholders.

(Proxy Statement, p. 17.) In the very next paragraph, the Proxy Statement reports trustee Olsen's belief that "current market conditions in the Pacific Northwest are not conducive to the most advantageous sale of the Trust." (*Id.*) That statement implies that Mr. Olsen believed the economy would

improve. Mr. Olsen's statement, and the Board's statement recognizing PacTrust as an ongoing business with potential future growth, disprove plaintiff's contention that the Proxy Statement paints a gloomy economic future for PacTrust.

Plaintiff's primary economic evidence was that the Federal Reserve Board eased the money supply in the late summer of 1982; that the prime rate thereafter dropped until the Federal Reserve Board made a reversing correction in the late spring of 1983; and that the stock market and lumber business showed improvement in the fourth quarter of 1982. (Goldy testimony, IV Transcript, pp. 111–48.) Defendants responded to this testimony cogently at the conclusion of trial:

Mr. Goldy ... conceded his view, however, that the current outlook for the Pacific Northwest economy is pessimistic, and that Oregonians should "buckle their seat belts for another crash landing" this fall and winter. (Ex. 1228–29; 1232, pp. 34–35.) Moreover, the economic forecasts of Mr. Goldy and other economists in January of 1983 were extremely cautious. *See* Ex. 1234 (four economists predicted "mild improvement" in 1983, but agreed there are "enough flaws in the economic framework to make it difficult for the recovery to continue throughout the year"; Goldy warned that credit defaults could turn "worldwide recession into a worldwide depression"); Ex. 1235 (Goldy article published January 30, 1983 stating that the United States is experiencing its worst unemployment level since the Great Depression and that the US economy must be quickly turned around in order to avoid economic disaster); Ex. 1236A (*Oregon Business Barometer* for February 1983) ("despite our hopes for increased business activity by the end of 1982 the economy was still bumping sideways in the fourth quarter. Some sectors demonstrated renewed signs of life, but the economy overall seemed prepared for hibernation"). Mr. Goldy also testified that any economic projections as of January 1983 would need to be qualified in light of uncertain and variable factors including the impending collision of federal and private borrowing demands and its likely effect on interest rates.

(Defendants' Post-Trial Brief, pp. 18–19.) In addition, Mr. Goldy testified that he was not particularly familiar with the real estate market in which PacTrust competes. (IV Transcript, pp. 146–48.)

I found the testimony of Robert Scanlan persuasive. He is vice-president and manager of the Portland, Oregon office of Coldwell Banker Commercial Real Estate Services. Mr. Scanlan testified that the boom in the stock market beginning in August, 1982, was not shared by industrial real estate in the Portland market. He stated that the metropolitan Portland industrial real estate market declined in 1982 as compared to prior years. (Expert Opinion of Robert D. Scanlan, p. 8.) He testified that it remained flat during the fourth quarter of 1982. (VI Transcript, p. 89.) He testified that the national industrial vacancy rate at the end of 1982 was approximately nine percent, substantially higher than the vacancy rate at the end of 1981. (*Id.*, p. 107.)

I was impressed with the testimony of R.J. Frank, chairman of the board of a Portland, Oregon firm, which values real estate, and former national president of the Society of Real Estate Appraisers. He stated that the market for industrial real estate in the Portland area got worse in the fourth quarter of 1982. (VI Transcript, p. 151.) He also pointed out that approximately 26 percent of PacTrust's leases were coming up for renewal in 1983. (*Id.*, p. 149.) PacTrust faced the possibility of loss of revenue because it "had a lot of roll-over coming over ... into a very competitive market." (*Id.*)

I also note that Messrs. Bechen, Wyse, and Truax testified they were not aware of any material change in the economy affecting PacTrust during the fourth quarter of 1982.

I find that market values for the sale and lease of office and industrial properties in

PacTrust's market deteriorated from November, 1981, through 1982 and had not improved by January 21, 1983, the date of issuance of the Proxy Statement.

Even if there were a sound basis for optimistic economic projections as of January, 1983, several courts have held that such projections do not belong in a proxy statement. *See, e.g., Flum Partners v. Child World, Inc.*, 557 F.Supp. 492, 499 (S.D.N.Y.1983) (dismissing claims of failure to disclose that projected end of recession would result in substantial increase in earnings); *Staffin v. Greenberg*, 509 F.Supp. 825, 837 (E.D.Pa.1981), *aff'd*, 672 F.2d 1196 (3rd Cir.1982) (granting summary judgment against plaintiffs' assertion that failure to disclose anticipated dramatic improvements in defendant company's sales and earnings due to a favorable hog cycle).

■ In addition, information regarding the economy is available to shareholders from general sources. In fact, plaintiff's expert used *Time, Business Week,* and similar sources. (Goldy testimony, IV Transcript, p. 116.) Matters of public knowledge are not required to be disclosed in proxy materials. *See Seibert v. Sperry Rand Co.*, 586 F.2d 949, 952 (2nd Cir.1978). In any event, general economic projections would not be material in light of more specific trends for PacTrust earnings which were disclosed in the Proxy Statement.

I find defendants made no misstatements in the Proxy Statement with respect to economic conditions affecting PacTrust. I find any additional economic information which might have been included would not have significantly altered the "total mix" of information made available to shareholders.

## III. CONFLICTS OF INTEREST.

■ Plaintiff alleges the Proxy Statement fails to disclose a number of conflicts of interest. The most significant charge is failure to disclose certain relationships among the Oregon Public Employees Retirement System ("OPERS"), Alex. Brown, and KKR.

The Oregon Investment Council ("OIC") has investment responsibility for several Oregon state funds, including the OPERS funds. OPERS is a participant in an equity pool managed by KKR. Each participant is obligated to invest up to its maximum commitment, if directed by KKR.[4] Subsequent to the November 15, 1982, Plan and Agreement of Exchange between PacTrust and Holding, KKR called on OPERS to invest $1.49 million in the PacTrust transaction. This constituted 7.1 percent of the acquisition cost (and 0.004 percent of the total assets managed by OIC).

Alex. Brown, PacTrust's investment banker, rendered fairness opinions in November, 1981, November, 1982, and January, 1983. (Exhibits 6, 12, 13.) Alex. Brown Realty Advisors, Inc., a subsidiary of Alex. Brown, advises OPERS with respect to real estate investments. In that capacity it manages certain OPERS funds. Plaintiff contends Alex. Brown's dual role as advisor both to PacTrust and OPERS represented a conflict of interest which should have been revealed in the Proxy Statement.

The undisputed testimony was that Alex. Brown received no benefit whatsoever by what turned out to be relatively minor participation in this transaction by OPERS. (*See, e.g.,* Oliver testimony, IV Transcript, pp. 66–67.) As a matter of fact, Alex. Brown lost the $380,000 commission it would have received had it brought KKR to PacTrust as the "white knight." (*See id.,* p. 67.) And Alex. Brown had no management responsibilities (with resultant fees) for OPERS's investment in the PacTrust transaction. (*See id.,* p. 66.)

Additionally, on November 5, 1982, the date that Alex. Brown rendered its fairness opinion on the KKR transaction, it did not

---

**4.** The size of the KKR pool is $316 million. OPERS's maximum commitment to the pool is $25 million.

even know that KKR was the buyer.[5] Even *if* Alex. Brown had known the identity of the buyer, it would not have known that OPERS would be a participant in the transaction. It was not until a short time later that KKR decided to use its pool to finance this transaction.[6]

I conclude there was no conflict of interest and no violation of the securities laws pertaining to the OPERS/Alex. Brown/KKR relationship.

 Plaintiff also alleges an undisclosed conflict of interest regarding the role of William Wyse, a partner in defendant Stoel, Rives, Boley, Fraser and Wyse ("Stoel, Rives"). Stoel, Rives represented both PacTrust and OPERS. Mr. Wyse was a trustee, officer, and attorney for PacTrust and an attorney for OPERS. Plaintiff finds a conflict in Mr. Wyse's role as a negotiator with KKR, arguing he represented both buyer (OPERS) and seller (PacTrust).

I find that on November 15, 1982, the date Mr. Wyse voted with the other trustees to approve the Plan and Agreement of Exchange, Mr. Wyse did not know of any involvement by OPERS in the acquisition of PacTrust by KKR. I accept his testimony to that effect. (Wyse testimony, V Transcript, pp. 239–40.) While Mr. Wyse and Stoel, Rives worked for OPERS in connection with various real estate transactions—mainly handling secured mortgage loans made with OPERS funds (*see id.*, p. 209)—none of the work had any relationship to the PacTrust-KKR sale. Mr. Wyse sold his stock in PacTrust like everyone

else. He received no special benefit from the transaction. There is no requirement that a relationship such as that between Stoel, Rives and OPERS be disclosed.

I conclude there was no conflict of interest and no violation of the securities laws pertaining to the OPERS/Wyse/Stoel, Rives relationship.

 Plaintiff further alleges a failure to adequately disclose an asserted conflict of interest of Peter Bechen. She argues the Proxy Statement fails to disclose that other persons in positions similar to that of Mr. Bechen had, after previous KKR leveraged buyouts, been given an opportunity to participate in subsequent KKR transactions. There is no evidence that Mr. Bechen was given such an opportunity.

Plaintiff also notes that Mr. Bechen received a ten percent salary increase shortly after the KKR transaction was finally approved. I find his increase, in March, 1983, was on the normal anniversary date of PacTrust's annual salary reviews. I further find the amount was no more than he likely would have received had PacTrust remained a publicly traded company. Furthermore, the Proxy Statement disclosed that "Holding intends to review the salary levels and fringe benefits of all of the employees of PacTrust from time to time with a view to maintaining a high quality of service to the Trust." (Proxy Statement, p. 22.)

I accept Mr. Bechen's testimony that his position was not improved by the KKR transaction. I was very impressed with his

---

**5.** Mr. Wyse testified that the trustees were very anxious to avoid early disclosure of the identity of the buyer. Such disclosure might alert APCI or some similar two-step bidder to make a bid for the control block. The minutes of the Ad Hoc Committee dated November 5, 1982 (exhibit 1060) reflect that the identity of the buyer was not disclosed to Alex. Brown. The Alex. Brown opinion of that date (exhibit 1061) confirms this conclusion. Messrs. Bechen, Wyse, Oliver, and Kovach all testified that Alex. Brown was not told who the buyer was until after the opinion was issued.

Mr. Oliver's meeting with Mr. MacDonnell in October, 1982, did not cause Mr. Oliver to learn of KKR's interest in PacTrust. While PacTrust

was mentioned, it was not discussed in any detail, and mainly during the course of a general discussion of REITs. (*See* Oliver testimony, IV Transcript, pp. 64–65. *Cf.* MacDonnell testimony, III Transcript, pp. 77–78.) Mr. MacDonnell was very careful not to allude to any relationship between KKR and PacTrust during this meeting. (*See* MacDonnell testimony, III Transcript, p. 80.)

**6.** There is no evidence that OIC knew that KKR would call on the committed funds until November 19, 1982. (*See* Exhibit 289.) As a member of the blind pool, OIC had no discretion whether to invest in the PacTrust acquisition.

testimony. He was forthright. I find he conscientiously believed it was in the best interest of the stockholders to sell the stock. He was working for their interest and not his own. I find there was no self-dealing on his part. Mr. Bechen had no written commitment to what his future would be, and he had to sell his shares of PacTrust just like everyone else. While he knew that KKR frequently kept management, there was no certainty of that. The only thing he got after the transaction was completed was the type of raise he would have expected before. Trustee Olsen testified he did not believe Mr. Bechen's new position would be an improvement for him. (III Transcript, p. 124.)

Mr. Bechen and three other officers of PacTrust (but no other trustees) were offered the opportunity to invest in Holding. Mr. Bechen's interest in the transaction was revealed. (*See* Proxy Statement, pp. 7, 21–23, 26; *infra,* section V.B.) Under O.R.S. 57.265, a corporation's transaction in which a director is interested is not void or voidable if the interest is disclosed to the board and the vote of the interested director is not needed for approval or, whether the interest is revealed or not, if the transaction is fair and reasonable to the corporation. (*See also* Wyse testimony, V Transcript, pp. 195–97; Booth testimony, VI Transcript, p. 22) The information required by the Securities and Exchange Commission Schedule 14A, 17 C.F.R. § 240.14a–101, item 4 ("Interest of Certain Persons in Matters To Be Acted Upon"), was disclosed.

I conclude there was no violation of the securities laws pertaining to the Bechen/KKR relationship.

I further find that Brian Booth, the lawyer primarily responsible for drafting the Proxy Statement and Booth's firm, Tonkon, Torp, Galen, Marmaduke and Booth ("Tonkon, Torp"), had no conflict of interest and knew of no conflict that was not disclosed. They had every motivation to make a complete and careful investigation and disclosure of all material facts. I conclude they did so.

I was particularly impressed with Mr. Booth's testimony, the extent of his investigation, and the thoroughness with which he prepared the Proxy Statement.

There is no contention that the large shareholders had a conflict of interest and, in any event, I find they had none. They were knowledgeable in the market and favored the sale.

There were no conflicts of interest by any of the PacTrust officers or directors that were not disclosed in the Proxy Statement.

In summary, while plaintiff relies on a theory of negligence, she has alluded to a conspiracy to bring about the KKR transaction based on the undisclosed self-interest of various participants. There was no special benefit to Messrs. Bechen, Wyse or Booth, Alex. Brown, or the Stoel, Rives or Tonkon, Torp firms from this transaction. The only interest was on the part of KKR, the buyer.

## IV. OVERALL PICTURE OF THE PROXY STATEMENT

▮ Plaintiff contends the Proxy Statement misled the shareholders by its overall impression and tone apart from the specific misrepresentations and omissions alleged. She argues the Proxy Statement was written to place the shareholders in a state of fear, that multiple misrepresentations and omissions, even if not misleading individually, render the Proxy misleading in the aggregate, and that the Proxy was drawn to avoid liability rather than to disclose the truth. (Plaintiff's Post-Trial Brief, pp. 39–42.)

Plaintiff alleges no substantive misrepresentations or omissions not previously or subsequently discussed in this opinion. Rather, she takes a new tack in her argument. It is unpersuasive.

Plaintiff contends the Proxy Statement was written to place the shareholders in a state of fear by portraying both a threat from APCI and economic "doom and gloom." She argues again that

any "threat" posed by APCI *disappeared* by December 1, 1982, as a result of the combination of this Court's injunction against the tender offer .... and the amendment to PacTrust's Declaration of Trust restricting ownership. The continuing attempt in the Proxy Statement to paint APCI red as the devil can be seen as nothing more than patently misleading and deceptive.

(*Id.*, p. 40, emphasis added.) In the accompanying footnote, plaintiff cross-references her Itemized Submission of Contentions "which demonstrate[s] that APCI was never the type of 'threat' portrayed by Pac-Trust." (*Id.*, n. 19.)

I was the trial judge in *Pacific Realty Trust v. APC Investments, Inc.*, Civil No. 81–1046–PA (D.Or., Nov. 20, 1981), *remanded on other grounds*, 685 F.2d 1083 (9th Cir.1982). Management of PacTrust could have and did reasonably believe the APCI tender offer represented a real threat to the interests of the PacTrust stockholders. The Proxy discloses John Olsen's position to the contrary. (*See* Proxy Statement, p. 17.) The Proxy Statement also forthrightly declares that "PacTrust has become less vulnerable to unfriendly takeovers as a result of adoption of the Declaration of Trust amendment ...." (*Id.*, p. 15.) I find defendants fully and accurately disclosed all facts material to the APCI threat.

I have previously found the Proxy Statement was not misleading with respect to its discussion of economic conditions. (*See* section II, *supra.*)

I find that overall, the Proxy Statement realistically pictured the actual situation with respect to APCI and economic conditions. There is no merit to plaintiff's other arguments that the Proxy Statement is misleading in the aggregate and that it was written to avoid liability rather than disclose the truth. On the contrary, the general impression one receives from reading the Proxy Statement is that its authors tried to make a "full and fair" disclosure of all material facts. Having heard the evidence presented at trial, I find they succeeded.

## V. KKR'S ROLE.

Plaintiff charges KKR acted improperly in this and other transactions and that the Proxy Statement should have revealed more information about KKR and its role. Specifically, plaintiff contends the KKR defendants use "well-developed tactics and plans in the leveraged acquisition of corporations in Oregon and other states"; Associates and Holding "are closely aligned with defendant KKR and, as such, are manipulative devices and sham affiliates"; KKR has acquired other corporations through the use of management incentives; the KKR defendants failed to disclose sufficient details regarding the financing of the Exchange; KKR received an $800,000 fee for negotiating the Exchange and arranging the financing; KKR failed to disclose the identities of the investors in the limited partnerships providing a portion of the financing; the Proxy Statement did not reveal that it had been written in part by KKR; and certain other provisions in the Exchange effectively "locked-up" PacTrust and KKR. Whether these allegations are considered separately or as part of an overall "scheme," plaintiff has failed to establish a claim under the securities laws.

### A. *KKR's Other Transactions/Financing Of The Exchange.*

To make an informed decision, PacTrust shareholders needed information regarding the business and financial condition of their Trust. They needed information as to the interests of the directors voting in favor of the proposed Exchange, and information regarding payment for and tax consequences of the Exchange. They did not require information concerning KKR's other transactions and the reasons for KKR's success in the acquisition field. *See Missouri Portland Cement Co. v. H.K. Porter Co., Inc.*, 535 F.2d 388, 396–97 (8th Cir.1976) (tender offeror need not disclose past liquidation policies in connection with acquisitions); *Crane Co. v. Harsco*

*Corp.*, 509 F.Supp. 115, 121 (D.Del.1981) (past history of acquisition activity not material).

The Exchange Offer was for all of Pac-Trust's shares for cash. Pursuant to the Plan, all shareholders would be bound by the vote and either all, or no, shares would be sold. In this all-cash offer, shareholders would have no further involvement with KKR regardless of the outcome of the vote. Thus, omissions regarding KKR's past acquisition practices would not be material. *Cf. Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 481 n. 2, 97 S.Ct. 1292, 1305 n. 2, 51 L.Ed.2d 480 (1977) (Stevens, J., concurring in part) ("The motivation for the merger is a matter of indifference to the minority stockholders because they retain no interest in the corporation after the merger is consummated.").

In *Lewis v. Oppenheimer & Co.*, 481 F.Supp. 1199 (S.D.N.Y.1979), the court granted summary judgment for defendants and rejected plaintiff's argument that the buyers' financing method should have been disclosed. The plaintiff, a shareholder of Big Bear Stores Company, challenged the sale of substantially all of the company's assets for cash to a newly organized company. The plaintiff argued that the buyers' method of financing should have been disclosed in the proxy statement to "inform the shareholders of (1) how much of their 'own' money the buyers were using, and therefore of (2) how fair their offer was." *Id.* at 1207. The court stated that fairness of the offer had no conceivable relationship to the buyers' method of financing it:

> Plaintiff's argument implies that it is somehow suspect for a buyer to use an acquired asset as collateral for a loan, or that in so doing the buyer somehow derives a secret benefit to which he is not entitled. A buyer's use of an acquired asset, however, is his own concern.

*Id.* See also *Bertoglio v. Texas Intern'l Co.*, 488 F.Supp. 630, 659 (D.Del.1980) (buyer of company need not disclose that company's assets would be used to secure the loans).

Moreover, the Proxy Statement contained detailed descriptions of the financing of the Exchange, including the use of a secured revolving loan, the basic composition of KKR, KKR Associates, and Holding, and the conditions precedent to the lender's obligations. While the Statement omits to name the lender, the only effect of disclosing that Bankers Trust was the lender would likely have been favorable. *See Raybestos-Manhattan, Inc. v. Hi-Shear Industries*, 503 F.Supp. 1122, 1129 (E.D.N.Y.1980) (failure by tender offeror to disclose that Bankers Trust would be the sole source of line of credit, a change from offeror's original plan to obtain financing from Bankers Trust and three other banks, held not material). I find that disclosure of the name of the lender would have not altered the "total mix" of information made available in the Proxy Statement.

### B. *Management Incentives.*

 Plaintiff suggests wrongdoing by KKR in its use of management incentives as part of its "well-developed tactics" in leveraged buyouts. Courts have held that the use of such incentives in a particular transaction does not violate the securities laws as long as the underlying facts are disclosed. *See, e.g., Golub v. PPD Corp.*, 576 F.2d 759 (8th Cir.1978). Here the management incentives were fully disclosed. (*See* Proxy Statement, pp. 7, 21–23, 26.) It follows that any "pattern or practice" by KKR of using such incentives in *other* transactions could have no bearing on the shareholders' decision. Information about other KKR transactions would not have alerted the "total mix" of information made available.

### C. *KKR's Fee.*

 Plaintiff correctly points out that KKR was to receive a fee of $800,000 for arranging the Exchange, including the financing. This agreement is disclosed. (*Id.*, p. 21.) The fee was not deducted from and had no effect on the $38.50 price. It was payable by Holding to KKR after the close of the transaction. (*See, e.g.,* Olsen

testimony, III Transcript, pp. 101–103.) There was no omission in the Proxy Statement on this point.

### D. *KKR's Authorship Of Portion Of Proxy Statement.*

 Plaintiff contends the Proxy Statement failed to reveal that attorneys for KKR had written a substantial portion of it, or that KKR and its attorneys were given copies of all parts of drafts of the Statement.

Each of the three witnesses at trial who had experience in transactions of this kind, Messrs. MacDonnell, Booth, and Wyse, testified that it is a common practice for the buyer's counsel to participate in drafting the proxy statement. The reasons for such participation are obvious. The buyer has a substantial interest in assuring itself of the accuracy of the statement because any liability against the issuer may be at the buyer's expense. Also, the buyer is the only one in a position accurately to describe itself, its financing arrangements, and its future plans. It should have come as no surprise to any shareholder that certain sections of the Proxy Statement would have been drafted principally by counsel for KKR. Indeed, albeit in a roundabout way, the Proxy Statement so reveals.

The Proxy Statement declares:

.... Holding has supplied all the information in this Proxy Statement concerning KKR, KKR Associates, and Holding, the financing to be obtained for the Exchange and the plans for PacTrust after the Exchange. Except as otherwise indicated, all other information contained in this Proxy Statement has been supplied by PacTrust.

(Proxy Statement, p. 2.) The Statement later describes Holding:

Holding is a newly formed Delaware corporation organized by KKR solely for the purpose of effecting the Exchange. Currently, KKR Associates owns all of the issued and outstanding common stock of Holding.

(*Id.,* p. 21.) On the same page, the Statement describes KKR Associates:

KKR Associates, a New York limited partnership of which Messrs. Kohlberg, Kravis, Roberts and MacDonnell are the general partners, holds, as principal, major investments in a number of industrial and other companies.

Two limited partnerships of which KKR Associates is the general partner, together with other investors and a corporation associated with KKR, are expected to own, after the Exchange, 90 percent of Holding's voting common stock.

(*Id.*) It is obvious that KKR and its affiliates control Holding. Disclosure that certain information in the Proxy Statement was provided by an entity affiliated with KKR is sufficient. Whether such information came from the parent, its subsidiary, its lawyers, or some other agent is of no consequence, as long as the information is accurate. I find that a specific declaration that pages 21 to 29 of the Proxy Statement were written by Latham and Watkins, KKR's attorneys, (*see* exhibit 71), would not have altered the "total mix" of information made available.

### E. *Identities Of Equity Investors.*

 Plaintiff contends the nondisclosure of the identities of the equity investors in the two limited partnerships which participated in financing the Exchange was a material omission. Rejecting a similar contention, the *Lewis* court held that the equity investors in the purchasing entity "were quite simply offering to make a purchase at a given price which the sellers were free to accept or reject ...." 481 F.Supp. at 1207. The source of the funds is of concern to shareholders only where there is doubt as to the purchaser's ability to pay, an issue not raised in this action.

Moreover, I ordered plaintiff be provided with a list of the equity investors in Holding. The investors include Yale and Harvard Universities, several bank investment funds, and various state and private employee pension plans. After having full access to this information, plaintiff has not

provided any logical basis for requiring disclosure.

### F. "Lock-Up."

In the Agreement and Plan of Exchange, PacTrust and Holding agreed to mutual, liquidated damages of $380,284 (Proxy Statement, exhibit I, p. A–22, ¶ 6.16). They agreed that PacTrust would refrain from soliciting further offers but could respond to an unsolicited offer (*id.*, p. A–13, ¶ 4.9), and that PacTrust's trustees and officers would be indemnified for their conduct and actions connected with the transaction (*id.*, p. A–21, ¶ 6.15). Plaintiff contends these provisions effectively "locked-up" PacTrust and KKR "regardless of what might be in the best interests of the shareholders . . . ." (Plaintiff's Post-Trial Brief, p. 38.) She asserts a violation of 15 U.S.C. § 78n(e) for undue obstruction of the exercise of informed shareholder choice. (*Id.*)

The fee arrangements were fully described in the Proxy Statement. (Proxy Statement, pp. 3, 28–29; A–19; A–22.) In the event the Trustees received a better offer, and for that reason terminated the sale to KKR, KKR was to be paid a fee of $380,-284, an amount calculated as one percent of the gross value of the transaction, plus expenses. This fee would compensate KKR for its efforts in arranging the aborted transaction. It would reflect the fact that the higher offer occurred primarily because of the announcement of a firm offer from KKR. Indeed, the amount of the fee is equal to the one percent fee which PacTrust would have paid Alex. Brown if it had succeeded in finding a "white knight." (*See* Bechen testimony, II Transcript, pp. 276–77.) The fee was *not* payable if the PacTrust shareholders voted against the offer. (*See id.*, p. 277.) Hence, it could not have acted as an incentive for shareholders to vote in favor of the KKR proposal.

If Holding defaulted in completing the transaction because of a breach by the lending institutions of their obligations, Holding would owe PacTrust a fee of $380,-284. This would compensate PacTrust for its time and efforts involved in putting the transaction together and the injury from the delay in finding a suitable buyer for PacTrust.[7]

Plaintiff contends the Proxy Statement did not reveal until its 85th page that PacTrust had agreed to refrain from soliciting other offers. (Plaintiff's Itemized Submission of Contentions, p. 19.) This contention is incorrect. The Proxy Statement disclosed this term of the Agreement and Plan of Exchange on pages 5, 12, and 17.

Some degree of commitment by both parties was necessary to allow KKR to obtain financing and notify its equity investors. The Proxy Statement had to be prepared and the shareholders had to vote. The trustees reserved the right to consider any offers that occurred. They did consider two "feelers," neither of which developed into a firm offer. (*See* Proxy Statement, pp. 5, 16–17.). I find that the market for this type of acquisition was active. There was considerable publicity attending announcement of the KKR proposal. They had been soliciting for some time and this was the best offer. The commitment was appropriate.

The cancellation fee was reasonable in amount and fully disclosed in the Proxy Statement. It did not create an incentive to vote against the transaction, and would

---

**7.** The trustees negotiated a substantially lower breakup fee than that originally requested by KKR. They succeeded, against KKR's initial opposition, in making the fee reciprocal. (*See* Bechen testimony, II Transcript, pp. 276–77.)

Liquidated damages provisions are not uncommon:

The risk you take is that before you put a single dollar down on a business, another party will come in and outbid you and all that

time and money will have been spent for naught. Robert Todd Lang, a partner who specializes in leveraged buyouts at Weil, Gotshal & Manges, a New York law firm, suggests protecting yourself: "Tell the seller you want to have an agreement that in case someone else takes it out at a higher price you get paid back your expenses."

*A Leveraged Buyout: What It Takes,* BUSINESS WEEK, July 18, 1983, at 194, 198.

only have been paid if the trustees found a better deal.

Plaintiff referred to the indemnification agreement only in passing. She argues the Proxy Statement omits to explain the effect of the agreement: "to remove from the trustees the high standard of duty imposed by law in favor of a 'good faith' standard." (Plaintiff's Trial Brief, p. 19.) If the trustees were found to have violated the securities laws, it is not at all clear they could enforce the indemnification provision. *Cf. Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1288 (2nd Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Nelson v. Quimby Island Reclamation District,* 491 F.Supp. 1364, 1381 (N.D.Cal.1980). The indemnification agreement is disclosed in the Proxy Statement. (Proxy Statement, pp. 22, 28.)

## VI. JOHN OLSEN'S POSITION.

 Plaintiff contends the Proxy Statement is deceptive by "burying deep" trustee John Olsen's opposition to the KKR transaction and misrepresenting his vote on the Special Committee.

Mr. Olsen is vice president of Standard Insurance Company. He is an experienced businessman who manages a portfolio of a billion dollars in assets. His role in the KKR transaction was very significant. He was an insider who knew as much about PacTrust as did any director with the possible exception of Mr. Bechen.

The Proxy Statement advises in its "Summary":

As a member of the Special Committee, Trustee John R. Olsen abstained from recommending that the Board of Trustees approve the Agreement and also abstained from the vote by the Board of Trustees authorizing execution of the Agreement . . . . In response to a shareholder's question at PacTrust's annual shareholders meeting on December 1, 1982, Mr. Olsen said that he considers the KKR offer "grossly inadequate."

(Proxy Statement, p. 6.) The Statement later expanded on Olsen's position. (*See id.,* p. 17.)

Plaintiff contends the Statement is misleading when it declares the Special Committee "unanimously voted to recommend to the Board of Trustees that the price of $38 per share be considered an adequate price for PacTrust's shares . . . ." (*Id.,* p. 13.) That vote took place on November 5, 1982. The Minutes of the Special Committee for that date reflect that the decision to recommend the sale to the board of trustees was unanimous. (*See* Exhibit 1060, p. 5.) Mr. Olsen abstained during the November 15, 1982, votes. The Proxy Statement so discloses. I find the disclosures were accurate.

Defendants adequately and accurately disclosed Mr. Olsen's position. He so testified. (III Transcript, p. 119.) Defendants did not "bury" Mr. Olsen's position. In addition, Mr. Olsen testified that the Proxy Statement was completely accurate and made no significant omissions. (*Id.,* pp. 125–26.)

## VII. PLAINTIFF'S INDIVIDUAL CLAIMS.[8]

 I did not certify for class treatment plaintiff's section 18(a) claim, 15

---

**8.** Plaintiff makes certain other contentions in her class claims. (*E.g.,* Pretrial Order, Plaintiff's Factual Contentions 3(N), 3(O), 5(B), 5(O), 6(E), 6(J).) None of these contentions have merit. They are not material misrepresentations or omissions and do not otherwise state a claim under the securities laws.

I specifically find contention 6(J) lacks merit. In that contention, plaintiff alleges the Proxy Statement failed to disclose a KKR forecast, exhibit 68, prepared in November, 1982. The forecast indicated that by 1990 KKR expected PacTrust to grow to between $80 and $140 mil-

lion in net worth. (*See* Plaintiff's Itemized Submission of Contentions, p. 9.) The historical information in this acquisition financing memorandum, which was distributed to KKR's equity investors, was supplied to Mr. MacDonnell by Mr. Bechen and also appears in the Proxy Statement. In addition, Mr. Bechen supplied Mr. MacDonnell with projections based on various assumptions relating to rates of inflation, occupancy, rents, and interest. (Exhibit 122.) The same projections, in summary form, were disclosed. (Proxy Statement, p. 32.) The Proxy also discloses that

U.S.C. § 78r(a), or her pendent state claims for common law fraud and negligent misrepresentation. *Beebe*, 99 F.R.D. at 71. Each of those claims requires proof of individual reliance, as I held. *Id.* *See Ross v. A.H. Robins Co.*, 607 F.2d 545, 552–53 (2nd Cir.), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1979); *Heit v. Weitzen*, 402 F.2d 909, 916 (2nd Cir.1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969) (section 18(a)); *Rice v. McAlister*, 268 Or. 125, 128, 519 P.2d 1263, 1265 (1974) (common law fraud); *McDonald v. Title Insurance Co. of Oregon*, 49 Or.App. 1055, 1060, 621 P.2d 654, 658 (1980) (negligent misrepresentation). In addition, each of the claims requires proof of a material misstatement or omission. 15 U.S.C. § 78r(a); *Conzelman v. Northwest Poultry & Dairy Products Co.*, 190 Or. 332, 350, 225 P.2d 757, 764 (1950) (common law fraud); Restatement (Second) of Torts § 552 (1977) (negligent misrepresentation).

■ Plaintiff's individual claims fail for the same reason the class claims fail. There were no material misstatements or omissions.[9] In addition, I find plaintiff did not rely on the Proxy Statement. (*See*

> forecasts based upon differing assumptions were prepared by PacTrust's management and provided to KKR in October 1982 and summaries of the forecasts, along with certain adaptations, were provided by KKR to its prospective lenders and investors in November, 1982. (*Id.*)
>
> Sometime in late November or early December, 1982, Mr. Bechen was shown a draft of the KKR forecast. (*See* Bechen testimony, I Transcript, p. 184–A.) He reviewed the draft to assure the accuracy of the historical data contained in it. (*See id.*, II Transcript, p. 187.) He did not retain a copy, nor receive a copy of the final document. (*See id.*, VI Transcript, p. 161.) Brian Booth did not know of the forecast. (*See* Booth testimony, V Transcript, pp. 273–74.)
>
> The principal difference between the KKR forecast and the projections in the Proxy Statement is that the former gives effect to the acquisition debt. (*See* Bechen testimony, II Transcript, pp. 268–70.) Hence, disclosure of these figures would not have assisted the shareholders in making their decision. KKR's cash flow projections had no applicability to the Trust so long as it was publicly held. In addition, the projections in exhibit 68 depended on heavy borrow-

Deposition of Mrs. Beebe (April 18, 1983), p. 52.)

## CONCLUSION

There were no misrepresentations in the Proxy Statement. If there were any misrepresentations, they were not material. There were no material omissions from the Proxy Statement. The price offered by KKR—$38.50 per share—was a fair price.

Judgment will enter for defendants.

The foregoing constitutes findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.

> ing which would have presented an unacceptably high risk for a publicly held company. (*See id.*, pp. 270–74.)
>
> Defendants had no obligation to disclose the KKR forecast. A buyer always expects to do better than the seller. (*Cf.* Booth testimony, V Transcript, p. 272.) Inclusion of the substance of exhibit 68 would not have altered the "total mix" of information available to the shareholder.

**9.** As previously mentioned, *supra* note 1, I allowed Mr. Holland to intervene as a member of the class. He opposed the transaction. Mr. Holland's situation illustrates that the Proxy Statement was not needed to persuade shareholders to approve the transaction, because there was already overwhelming support for the buyout. Mr. Holland testified it was a "foregone conclusion" that KKR's proposal would be accepted. (I Transcript, p. 63.) He even cast his proxy *for* the transaction, to be a "good stockholder." (*Id.*, p. 65.) Mr. Holland testified, "I didn't think I was being lied to or anything of that nature." (*Id.*, p. 66.) He also stated his recognition that his beliefs concerning the value of the stock could be in error. (*Id.*, p. 65.) Mr. Holland's claims fail because the class claims fail.